In re INDEPENDENT CLEARING HOUSE COMPANY, a Trust, Debtor.

In re UNIVERSAL CLEARING HOUSE COMPANY, a Trust, aka National Clearing House Company, a Trust, Debtor.

In re ACCOUNTING SERVICES COMPANY, a Trust, Debtor.

Robert D. MERRILL, Trustee, Plaintiff-Appellee and Cross-Appellant,

v.

David ABBOTT, et al., Defendants-Appellants and Cross-Appellees.

Nos. C–84–0927W, C–84–0928J and consolidated cases.*

United States District Court, D. Utah, C.D.

July 23, 1987.

---

7. 9.3% (cost of funds) + .7% (risk factor) = 10.0%.

* For case numbers, see Appendix A.

William G. Fowler and Joel Dangerfield, Robert D. Merrill, Salt Lake City, Utah, for plaintiff.

Gary R. Appel, Rothgerber, Appel, Powers & Johnson, Denver, Colo., Laura Harris, Daniel Jackson and Jeffrey Wilkinson, Edward F. Guyon, Salt Lake City, Utah, for defendants.

Before JENKINS, Chief Judge, and WINDER and J. THOMAS GREENE, District Judges, sitting en banc.

## MEMORANDUM OPINION

JENKINS, Chief Judge.

On September 30, 1985, this court, sitting en banc, heard cross-appeals from the decision and judgments of the United States Bankruptcy Court for the District of Utah in numerous adversary proceedings brought by the trustee in bankruptcy of the debtor entities against named defendants.[1] The appeals had been consolidated for purposes of briefing and oral argument. At oral argument William G. Fowler and Joel R. Dangerfield appeared on behalf of the bankruptcy trustee, plaintiff-appellee and cross-appellant Robert D. Merrill, who also appeared in his own behalf. Daniel W. Jackson and Jeffrey W. Wilkinson appeared on behalf of over 350 defendants-appellants; Edwin F. Guyon appeared on behalf of some 80 other defendants-appellants; Laura M. Harris and Garry R. Appel appeared on behalf of defendant-appellant Ruby Van Sant; and defendants-appellants Thomas D. Richards and Charles A. Schultz appeared pro se. After oral argument the court took all the matters under advisement. After reviewing the records of these appeals, the arguments of counsel and the pertinent authorities, the court now enters this memorandum opinion. Each appeal has been considered on its own merits. Most of the questions decided are common to all.

### I.

### BACKGROUND

These consolidated adversary proceedings arose out of the collapse of an alleged Ponzi scheme.[2] The debtors are Independent Clearing House Company (ICH) and Universal Clearing House Company (UCH) (the clearinghouses) and Accounting Services Company (ASC). Each of the debtor entities is a "Massachusetts" or common-

---

1. The trustee in bankruptcy filed some 2,085 adversary proceedings. Over 1,000 appeals from the bankruptcy court's decision were filed in this court. Many of the appeals have been dismissed as duplicates, and many of the proceedings have settled since oral argument in these appeals. For a list of the remaining 421 appeals, see appendix A.

2. The affidavit of the trustee's accountant, who was also the original trustee, alleges that the debtor enterprises were conducted as a Ponzi scheme. Affidavit of Ron N. Bagley in Support of Trustee's Amended Motion for Summary Judgment ¶ 19 at 7 [hereinafter cited as Bagley affidavit]. None of the defendants dispute that assertion.

A "Ponzi" scheme, as that term is generally used, refers to an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments. Typically, investors are promised large returns for their investments. Initial investors are actually paid the promised returns, which attract additional investors.

*Merrill v. Abbott (In re Independent Clearing House Company),* 41 B.R. 985, 994 n. 12 (Bankr. D.Utah 1984) (citation omitted). For the colorful history of Ponzi schemes, see *id.* at 994–95 n. 12 and works cited therein.

law trust,[3] domiciled in the Grand Cayman Islands, British West Indies. ASC's stated business was to provide management consulting services and accounting and payable services to client companies. ICH and UCH were to provide clearinghouse services for ASC, its clients and associated entities. Bagley affidavit ex. A. The stated business purpose of the trusts was to solicit funds from private investors, called "undertakers," and to use the funds received to assume and pay at a discount the accounts payable of ASC's clients. The trusts were to make a profit by receiving repayment from the client companies in excess of the discounted sums paid.

The "undertakers" signed contracts by which they committed to one of the clearinghouses a specified sum of cash, credit or other commodities for a period of nine months. The funds committed to the clearinghouse were to remain under the clearinghouse's custody and control until the end of the nine months, at which time the principal amount was to be repaid to the undertaker. Under the terms of the contracts, undertakers assumed the debts of ASC's clients, and ASC assigned to the undertakers the right to receive payment from its clients. Thus, in addition to the return of his principal, an undertaker was also to receive additional sums purportedly representing "revenues" from the client companies. An undertaker could elect to receive revenues or "earnings" in fixed monthly payments over the nine months or in a lump sum at the end of the nine-month period. If an undertaker chose to be paid monthly, he was to be paid at a rate of .0015 times his investment per business day for twenty business days each month. If he chose to be paid at the end of the nine months, he was to be paid at a rate of .004 times his investment per business day, which worked out to $84 per month per $1,000 invested. See 41 B.R. at 994 (statement of undisputed facts); Bagley affidavit ¶¶ 9–12 & ex. A. The clearinghouses were to retain full control of the right to revenues assigned to undertakers. Bagley affidavit ex. A.

The bankruptcy trustee has alleged, without contradiction, that ASC had no clients. Bagley affidavit ¶ 15. Apparently, the money supplied by undertakers went into a common fund, from which "earnings" were paid and principal repaid. Later undertakers supplied the money to pay "earnings" and repay principal of earlier undertakers. Id. ¶¶ 16–20.[4]

On September 16, 1981, ICH and UCH filed petitions for relief under chapter 11 of the bankruptcy code.[5] ASC filed a chapter 11 petition on December 17, 1981.[6] On September 25, 1981, the bankruptcy court appointed Dr. Ron N. Bagley as bankruptcy trustee pursuant to section 1104 of the Code. On October 26, 1982, Dr. Bagley resigned as trustee, and the court appointed Robert D. Merrill to take his place. On September 15, 1983, within the limitations

---

**3.** A Massachusetts trust is a business organization in trust form. Property is conveyed to trustees and managed for the benefit of individuals holding certificates representing a share of the beneficial interest in the trust property. See generally Merrill v. Abbott, 41 B.R. at 991 n. 2 and authorities cited therein. It is not clear from the record who were the certificate holders in the debtor trusts.

The Massachusetts trusts are not to be confused with the bankruptcy estate, which is administered by Robert D. Merrill, the bankruptcy trustee. The bankruptcy trustee has sequestered the assets of each of the Massachusetts trusts.

**4.** On February 17, 1987, a jury found six of the debtors' principals guilty of various offenses, including mail fraud, interstate transportation of money taken by fraud, bankruptcy fraud and racketeering. United States v. Cardall, No. CR-83–00065A.

**5.** Unless otherwise indicated, all statutory references are to the bankruptcy code (hereinafter referred to as the Code), enacted by title I of the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2549, and codified at 11 U.S.C. §§ 101–151326 (1982). Because the debtors' petitions in bankruptcy were filed in 1981, the substantive changes made to the Code by the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333 ("the 1984 amendments"), and by the Bankruptcy Judges, United States Trustees, and Family Farmers Bankruptcy Act of 1986, Pub.L. No. 99–554 ("the 1986 amendments"), do not apply to these cases. See Pub.L. No. 98–353, § 553, 98 Stat. at 392 (the 1984 amendments to title 11 apply only to cases filed at least 90 days after July 10, 1984, the date of their enactment); Pub.L. No. 99–554, § 302 (the 1986 amendments generally take effect 30 days after the date of their enactment).

**6.** Orders for relief were later granted against two related entities—against Tonder Payable Service Company on April 29, 1982, and against Payable Accounting Company on August 16, 1982.

period of section 546(a), Mr. Merrill, as trustee, brought some two thousand adversary proceedings to recover funds that the debtors had paid to undertakers as "earnings" or as repayment of funds the undertakers supplied the trusts.

The defendants in these actions were all undertakers who received some payments from the debtor trusts within one year of the debtors' filing their bankruptcy petitions, either as "earnings" or repayment of principal or both. The defendants for the most part fall into two categories: (1) those who advanced money early and received "earnings" and repayment of principal in excess of their initial advance, and (2) those who advanced money and received some payments of "earnings" or repayments of principal or both but no more than their initial advance.[7]

The trustee's complaint set out four claims for relief. The first claim sought to avoid as preferences under section 547 of the Code transfers of money that the debtors had made to a defendant within ninety days prior to the filing of the debtors' bankruptcy petitions. The second claim sought to avoid as fraudulent conveyances under sections 548 and 544 transfers of money that the debtors had made to a defendant in excess of his advance and within one year before filing their petitions. The third claim sought to avoid on the same grounds *all* transfers of money that the debtors had made to a defendant within one year of filing their petitions.[8] The fourth claim sought to disallow claims that a defendant had filed against the estate unless the defendant remitted to the estate the allegedly preferential and fraudulent transfers he had previously received.

On March 30, 1984, the bankruptcy court entered default judgments against some of the defendants. It later denied the defendants' motions to set aside those judgments.[9] On August 6, 1984, the bankruptcy court entered a memorandum opinion

disposing of the remaining cases. *Merrill v. Abbott (In re Independent Clearing House Company)*, 41 B.R. 985 (Bankr.D. Utah 1984). The bankruptcy court granted the trustee's motion for summary judgment on his first and second claims for relief. It also granted summary judgment to each of the non-defaulting defendants on the trustee's third claim for relief and dismissed those claims with prejudice. The court also awarded the trustee prejudgment interest on his successful claims, from September 15, 1983, the date he filed his complaint.

The trustee appealed from the bankruptcy court's dismissal of his third claim for relief, and many of the defendants appealed from the court's grant of summary judgment to the trustee on his first and second claims for relief.

On June 5, 1985, this court ordered all pending appeals from these proceedings—including the appeals from the bankruptcy court's entry of summary judgment and the appeals from the orders denying motions to set aside default judgments—consolidated for purposes of briefing and oral argument.

## II.

### JURISDICTION

Some of the defendants argue that the bankruptcy court lacks subject matter jurisdiction in this case because the debtor entities cannot qualify as "debtors" under the bankruptcy code. A motion to dismiss for lack of subject matter jurisdiction can be made at any time in a proceeding, including for the first time on appeal. Generally, an appellate court will not reverse a lower court's findings of jurisdictional facts unless "clearly erroneous." *See Eaton v. Dorchester Development, Inc.*, 692 F.2d 727, 732 (11th Cir.1982); *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir.), *cert. denied*, 454 U.S. 897, 102 S.Ct.

7. Those who invested in the scheme between October 1980 and June 1981 and did not withdraw their funds early received returns on their investments ranging from 3 to 76 percent. Some 924 investors deposited a total of over $4 million after June 12, 1981, and received no payments on their investments. 41 B.R. at 995.

8. From the way the trustee characterized his claims both in his complaint and at oral argument before this court, one would expect the trustee to state a claim against every defendant

under his third claim, but such is not the case. *See* appendix A. Moreover, one would expect that the trustee's third claim against a given defendant would be no less than his first or second claims against the same defendant, but in some cases the trustee's first or second claim exceeds his third claim. The trustee has offered no explanation for these apparent inconsistencies.

9. The facts underlying the entry of these default judgments are set out in part VI of this opinion.

396, 70 L.Ed.2d 212 (1981). *See also* Bankruptcy Rule 8013.

■ Some defendants argue that the debtors in this case do not qualify for relief under title 11. Section 301 of the Code provides that only an entity that can qualify as a "debtor" under a chapter of title 11 can file a voluntary case under that chapter. The Code further provides that only "persons" can be debtors under chapter 11. *See* 11 U.S.C. § 109(a), (b) & (d). It defines a "person" to include an "individual, partnership, and corporation," *id.* § 101(30), and further defines a "corporation" to include a "business trust," *id.* § 101(8)(A)(v). The defendants argue that the debtor enterprises (Massachusetts trusts) are not "business trusts" and are therefore not eligible for relief under the Code. If the debtors are not eligible for relief under the Code, then the statutory source of the bankruptcy court's exercise of jurisdiction in these adversary proceedings is lacking, and they must be dismissed.

This court has previously considered this argument in a related case. *Merrill v. Allen (In re Universal Clearing House Co.)*, 60 B.R. 985, 990–93 (D.Utah 1986). For the reasons stated in that opinion, we conclude that the debtor trusts qualify as business trusts under the Code. The defendants' motions to dismiss for lack of subject matter jurisdiction based on the trusts' alleged lack of status as debtors are denied.

■ Several defendants argue that the bankruptcy court also lacks subject matter jurisdiction because the debtors filed their bankruptcy petitions in "bad faith." The defendants raise this issue for the first time on appeal in the mistaken belief that good faith in filing is a prerequisite to the existence of subject matter jurisdiction in the bankruptcy court. This court has pre-

viously considered that argument and rejected it. *See id.* at 993–94. For the reasons stated in *Allen*, we reaffirm that position.

Although a good faith standard continues to exist under the Code, as *Allen* demonstrates, dismissal of a bad-faith filing is a matter of court discretion under 11 U.S.C. § 1112(b)—not a matter of jurisdiction.[10] 60 B.R. at 993–94 and cases cited therein. Dismissal (or conversion to chapter 7) is a determination that even though the court has jurisdiction over the case, proceeding with the case under chapter 11 would not be in the interests of justice or in the best interest of creditors. Otherwise, the bankruptcy court would have *no* discretion and would have to dismiss all bad-faith filings.

In short, the bad faith question requires a discretionary, equitable determination under section 1112(b) and must be considered in the first instance by the bankruptcy court. The question of jurisdiction is a separate question and has nothing to do with bad faith. Jurisdiction exists here as a matter of law, regardless of any bad faith on the part of the debtors. The defendants never raised the bad faith issue in the bankruptcy court, and, as a general rule, this court will consider on appeal only those issues raised before the bankruptcy court. *In re Pikes Peak Water Co.*, 779 F.2d 1456, 1459 (10th Cir.1985). The bankruptcy court did not abuse its discretion by failing to dismiss the petitions sua sponte.[11] Indeed, in our opinion, dismissal would have been an abuse of discretion under the facts of this case. Because the bankruptcy court did not abuse its discretion in failing to dismiss the actions as bad-faith filings, the motion to dismiss the filings must be denied.

---

**10.** Section 1112(b) stated in pertinent part:

... [O]n request of a party in interest, and after notice and a hearing, the court may convert a case under this chapter [chapter 11] to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, including—

(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

(2) inability to effectuate a plan;

(3) unreasonable delay by the debtor that is prejudicial to creditors;

(4) failure to propose a plan under section 1121 of this title within any time fixed by the court....

11 U.S.C. § 1112(b). The section was amended by the 1984 and 1986 amendments, but those amendments do not apply to this case. *See supra* note 5.

**11.** The court's conversion and dismissal powers under section 1112(b) are expressly conditioned upon a prior "request of a party in interest." Without ruling on whether the bankruptcy court could have considered the "good faith" of the debtors sua sponte, this court finds that it did not abuse its discretion by not doing so.

## III.

### MOTION FOR PERMANENT INJUNCTION

■ Before reaching the merits of the trustee's claims, we must address one other issue. On March 19, 1986, after oral argument on these appeals but before this court had rendered its decision, Daniel W. Jackson, on behalf of the defendants he represents, *see* appendix A, filed a motion for an order permanently enjoining the trustee from attempting to recover any property or the value of any property that the debtors had transferred to the defendants. The defendants argue that the adversary proceedings in the bankruptcy court, from which these appeals were taken, merely avoided certain transfers to the defendants as fraudulent or preferential—they did not authorize the trustee to "recover" the avoided transfers. Because more than a year has passed from the time the bankruptcy court avoided the transfers, the defendants argue, the trustee is barred from now recovering them.

Sections 544, 547 and 548 of the Code state that the trustee "may avoid" any transfer of an interest of the debtor in property that meets certain conditions. Section 550 states that, to the extent a transfer is avoided under one of those sections, "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from," among others, "the initial transferee of such transfer or the entity for whose benefit such transfer was made." However, section 550 includes a limitations provision: "An action or proceeding under this section may not be commenced after the earlier of—

"(1) one year after the avoidance of the transfer on account of which recovery under this section is sought; and

"(2) the time the case is closed or dismissed." 11 U.S.C. § 550(e).[12]

The defendants argue that the trustee's complaint in these adversary proceedings did not contain any cause of action brought under section 550 and that to date he has not commenced any action or proceeding

under section 550. Because more than a year has passed since the bankruptcy court avoided the transfers, the defendants argue, the trustee is now barred from recovering the transfers under section 550.

The complaint filed in each of these adversary proceedings states the "general nature of the trustee's claims" as follows:

In this adversary proceeding, plaintiff seeks to avoid transfers *and recover funds* paid to creditors of the above-named debtors within 90 days preceding the filing of the bankruptcy petition herein, which funds were paid for and on account of an antecedent debt, and which transfers constitute voidable preferences pursuant to 11 U.S.C. § 547. Plaintiff also seeks to avoid transfers *and recover all funds* paid to creditors upon the ground that such transfers were without fair consideration and constitute fraudulent conveyances within the meaning of 11 U.S.C. § 548 and § 25–1–1, *et seq.*, Utah Code Annotated (1953, as amended).

Complaint ¶ 5 (emphasis added).[13]

Each of the trustee's first three claims ended with the same prayer for relief:

WHEREFORE, plaintiff demands judgment against defendants, severally, that such transfers be set aside, *and that plaintiff have and recover from defendants the amount thereof,* together with interest as provided by law and his costs incurred herein, and for such other and further relief as the court deems just and proper.

Complaint at 8, 12 & 16 (emphasis added). Moreover, the judgments entered against the defendants read: "[I]t is hereby ORDERED, ADJUDGED AND DECREED that plaintiff, Robert D. Merrill, as trustee of the estates of the above-named debtors, *recover from defendant* [name] the sum of [amount]." (Emphasis added.)

As the parties recognize, avoiding a transfer and recovering the property transferred (or its value) are separate concepts. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 375 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6331. However, we believe the allegations of

---

**12.** The 1984 amendments substituted "or" for "and" between subparagraphs (1) and (2). However, the amendments do not apply to these proceedings. *See supra* note 5.

**13.** Apparently the trustee filed an amended complaint in at least some of the adversary proceedings. *See, e.g.,* Record on Appeal in No.

C85–0437W at 39. The amended complaint is not part of the record on appeal in all cases in which a record on appeal has been filed. However, the amended complaint is identical to the original complaint in every respect relevant to the defendants' motion for a permanent injunction.

paragraph 5 and the prayers for relief sufficiently state a claim for relief under section 550.

True, the complaint does not include a separate claim based solely on section 550, nor does the complaint even mention section 550. But in this day of notice pleading, such technical deficiencies (if they are indeed deficiencies) should not be fatal. The defendants have pointed to nothing in the Code requiring a trustee to file separate actions or even to state separate claims for avoiding and recovering transfers, and this court has found no such requirement. *Cf. Beneficial Fin. Co. v. Lazrovitch,* 47 B.R. 358, 361 (E.D.Va.1983) ("§ 550 does not set up any procedural method for recovery of the debtor's property interest" but merely tells from whom the trustee can recover a transfer); 4 *Collier on Bankruptcy* ¶¶ 550.02 at 550–5 n. 5 (L. King 15th ed. 1987) ("Normally the trustee's action to avoid a transfer will be coupled with an action for recovery of the property transferred or its value") & 550.-03[3] (the trustee "usually will file a consolidated action to avoid the transfer and recover the property transferred or its value"). Nor is this court inclined to read such a requirement into the Code or the rules of procedure.

When, as here, the action is against the initial transferee of an avoidable transfer, we believe that it is enough if the complaint, read as a whole and construed so as to do "substantial justice," *see* Fed.R.Civ.P. 8(f); Bankr.R. 7008, gives the defendant fair notice that the trustee seeks not only to avoid a particular transfer but also to "recover" the property transferred or its value. We find that the complaint in these adversary proceedings meets that requirement. Therefore, the defendants' motion for a permanent injunction is denied.

The trustee, as he is wont to do, *see infra* part VI, has moved for sanctions against the defendants for filing their motion. Specifically, he has asked for his court costs and attorney's fees incurred in responding to the motion. Although this court finds for the trustee on the merits of the defendants' motion, the law in this area—and the trustee's complaint—are not so clear as to make the defendants' motion frivolous, nor does that motion multiply these proceedings "unreasonably and vexatiously." *See* 28 U.S.C. § 1927 (1982). Therefore, the trustee's request for sanctions is also denied.

## IV.

## THE TRUSTEE'S CLAIMS

Our conclusion that the bankruptcy court had subject matter jurisdiction over the bankruptcy cases and hence these adversary proceedings and that the debtor entities were "persons" within the meaning of the Code and hence entitled to bankruptcy relief brings us to the question of whether the trustee in bankruptcy could properly recover prepetition payments to undertakers through the exercise of his statutory avoiding powers.

The trustee asserted three principal claims. The bankruptcy court allowed him to recover, under his first claim, all transfers to undertakers made within ninety days of the debtors' filing of their petitions in bankruptcy, on the grounds that the payments constituted preferences voidable under section 547(b) of the Code. The trustee was also allowed to recover, under his second claim, all transfers the debtors made to a defendant within one year of the debtors' filing of their petitions to the extent the transfers exceeded an amount equal to the original principal the defendant advanced.[14] The basis for the bank-

---

**14.** Under the terms of their contracts with the debtors, the defendants were entitled to both a return of their principal undertaking and payments in excess of their undertaking, which purportedly represented revenues or earnings. Payments of earnings were to be made monthly or in one lump sum at the end of the contract period, depending on the undertaker's election. Thus, a given defendant may have received more than one transfer from the debtors, some transfers representing a return of principal and some representing fictitious profits or earnings. The bankruptcy court, as did the Bagley affidavit, which supported the trustee's motion for summary judgment, lumped together all transfers to a given defendant. We believe the bankruptcy court was correct in so handling the

transfers. The debtors' characterization of a given transfer is not dispositive. The court must look at the substance of the transactions. If a given defendant received less than his undertaking, the amounts received should be considered return of principal, regardless of how the parties' may have designated them. On the other hand, to the extent all transfers to a defendant exceeded his undertaking, the amounts should be considered so-called earnings, regardless of the parties' designation. Otherwise, a defendant who contracted with the debtors in May 1981 and received only a small portion of his undertaking (designated as a payment of earnings) might be treated worse than a defendant who contracted with the debtors before September 1980 and received much more than his

ruptcy court's order was that such payments constituted fraudulent conveyances voidable under section 548(a)(2) of the Code. The defendants against whom judgments were entered appeal from these rulings, claiming that the bankruptcy court misconstrued sections 547(b) and 548(a)(2) of the Code. The trustee, on the other hand, appeals the bankruptcy court's conclusion that he could not recover, under his third claim, *all* transfers to each defendant made within one year of filing,[15] even those transfers that did not exceed the principal amount the defendant advanced to ICH or UCH. Before addressing the trustee's specific claims we shall consider a preliminary question of statutory construction that cuts across all three claims.

### A. "Property" of the Debtor

■ A trustee's powers to avoid prepetition transfers by the debtor are statutory. As with any case of statutory interpreta-

tion, our starting point must be the language of the statute itself. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring). Section 547(b) empowers the trustee to avoid "any transfer of property of the debtor," and section 548(a) empowers the trustee to avoid "any transfer of an interest of the debtor in property" if the transfers meet certain conditions.[16] The defendants claim that the transfers at issue here were not transfers of the debtors' "property" and thus could not be avoided under sections 547 and 548.[17]

This court has previously considered and rejected the defendants' argument that the money the debtors transferred to others was not "property" of the debtors. *Merrill v. Allen (In re Universal Clearing House Co.),* 60 B.R. 985, 994–97 (D.Utah 1986); *Merrill v. Dietz (In re Universal Clearing House Co.),* 62 B.R. 118, 122–24

undertaking although the only transfer he received within a year of bankruptcy was designated a return of principal.

**15.** It is not clear from the record when the first payments to investors were made. However, the debtors ran into trouble with several state securities commissions in June 1980, 41 B.R. at 992, so presumably they were conducting operations before that date, in which case some payments to investors would have fallen outside of the one-year period that we are concerned with (September 1980 to September 1981).

**16.** The 1984 amendments changed section 547(b) to allow the trustee to avoid "any transfer of an interest of the debtor in property" rather than "any transfer of property of the debtor," thus making it consistent with section 548(a). This amendment, however, does not apply to this case. *See supra* note 5.

**17.** The bankruptcy court misconstrued the defendants' argument: "Defendants' basic argument is that property obtained by fraud does not become property of the debtor's estate." 41 B.R. at 998. The court then launched into a discussion of whether the money paid to investors was "property of the estate."

"Property of the estate" is a term of art in bankruptcy law. Section 541 defines "property of the estate" in terms of different categories of "property" or "interest[s] in property," but nowhere does it define "property" itself, the very term at issue here. The defendants do not dispute that the money they received was "property." The only question is, Whose property was it? The Code offers no help in resolving that question. Therefore, the bankruptcy court's discussion of section 541 misses the mark.

The problems with the bankruptcy court's approach can be seen in its argument. In essence, the bankruptcy court reasoned that the money becomes "property of the estate" under section 541 if the trustee can recover it, 11 U.S.C. § 541(a)(3), or if it is preserved for the benefit of the estate, *id.* § 541(a)(4). If the trustee can avoid a transfer, he can recover it, *id.* § 550, and the money is preserved for the benefit of the estate, *id.* § 551. The trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute "property of the estate," and the trustee can recover them. *See* 41 B.R. at 999 (concluding that "[f]unds obtained from investors in a 'Ponzi' scheme are property, and are as susceptible of preferential and fraudulent disposition as other property"); *see also id.* at 1011 ("Property of the debtor includes preferences and fraudulent conveyances recovered by the trustee").

The bankruptcy court's approach begs the question. Transfers to investors in a Ponzi scheme are only preferential and fraudulent within the meaning of the Code if they were transfers of "property of the debtor" or of "an interest of the debtor in property." The bankruptcy court's approach presupposes that the transfers were of the debtors' property and therefore avoidable. If the transfers are avoidable, they are clearly property of the estate. But if the debtor had no interest in the property transferred, the transfers are not avoidable to begin with.

Despite the bankruptcy court's misstatement of the issue, it correctly concluded that property obtained by fraud does not always escape the debtor's estate.

(D.Utah 1986). For the reasons stated in those opinions, we conclude that, when a debtor obtains money by fraud and mingles it with other money so as to preclude any tracing and when the defrauded party does not timely avoid the transaction but accepts benefits under his contract with the debtor, the money is "property" of the debtor within the meaning of sections 547 and 548 of the Code. *See also DuVoisin v. Anderson (In re Southern Indus. Banking Corp.)*, 66 B.R. 349, 363–64 (Bankr.E.D.Tenn.1986) (if creditors are all victims of the debtor's fraud and their money has been commingled with other investors' money, they cannot claim that money they received from the debtor before bankruptcy was not the debtor's money).

Having concluded that we are dealing with "property" of the debtors, we shall now address the trustee's arguments for why he should be allowed to avoid each transfer and recover the property. The trustee asserted three principal claims. As did the bankruptcy court, we shall consider them in reverse order.

### B. The Trustee's Third Claim

Under his third claim the trustee sought to recover *all* payments made to undertakers within one year before the filing of the bankruptcy petitions.[18] He asserted three different legal theories. First, the trustee argued that the bankruptcy court, as a court of equity, had the inherent equitable power to avoid all transfers to undertakers. Second, he argued that the transfers were avoidable under section 548 of the Code as fraudulent conveyances. Third, he argued that they were avoidable under section 544(b), which gives the trustee essentially the same power to avoid transfers that an unsecured creditor has under state law. In support of this third argument, the trustee claimed that the transfers were avoidable under two distinct provisions of state law— under the corporate trust fund doctrine, and under the Utah Fraudulent Conveyance Act, Utah Code Ann. §§ 25–1–1 through –16 (1984).

We conclude that the bankruptcy court correctly denied the trustee's motion for summary judgment on his third claim because genuine issues of material fact existed. Those same factual issues made it error, however, for the bankruptcy court to grant, as it did, summary judgment to the defendants on the trustee's third claim. We therefore reverse the bankruptcy court's judgment as to those claims and remand them as more fully explained below.

---

18. The bankruptcy court may have misperceived the trustee's third claim. That court correctly stated that the trustee's third claim "seeks to set aside and recover *all* payments made to investors within the year preceding filing of the bankruptcy petitions," but concluded that the defendants named in the third claim were "net losers, having received from 3 percent to 76 percent of their original investments." 41 B.R. at 1005. This conclusion is apparently the result of misreading the Bagley affidavit, which formed the basis for the bankruptcy court's statement of undisputed facts. Dr. Bagley stated that the undertakers' "return on investment" varied from 0 to 76 percent, depending on the month in which a particular undertaker advanced funds to the clearinghouse. Bagley affidavit ¶ 23. The bankruptcy court read the phrase "return on investment" as "return *of* investment" and concluded that no defendant recouped the full amount of the funds he advanced. However, the very next paragraph of Dr. Bagley's affidavit states that some undertakers "were fully repaid out of the investment scheme early and suffered no net loss." *Id.* ¶ 24. Moreover, the Bagley affidavit lists, in exhibit D, those defendants who "withdrew from the purported accounts payable investment program and thereby received from the debtors *the full amount of their deposit, together with additional sums* representing ostensible 'profits' or 'earnings'." *Id.* ¶ 28 (emphasis added). The Bagley affidavit also states, "Until the investment scheme collapsed in July-September, 1981, Clearing Houses actually paid the contractual returns of $84 per month per $1,000 invested", *id.* ¶ 14, which is of course 8.4 percent per month, or roughly a 76-percent return for someone who contracted with a clearinghouse for the nine months before it ran into financial difficulties. In other words, the Bagley affidavit read as a whole suggests that a defendant who contracted with ICH for nine months beginning in October 1980 would have recovered not 76 percent of his principal, as the bankruptcy court thought, but his entire principal plus "earnings" totaling an additional 76 percent of his original undertaking. However, given the state of the record and the inconsistencies in the complaint itself, *see supra* note 8, the bankruptcy court's apparent error is understandable.

### 1. The Trustee's General Equitable Theory

■ The trustee first argued that the bankruptcy court has the inherent equitable power to avoid all transfers to undertakers in a Ponzi scheme. The bankruptcy court summarily rejected this argument, and properly so. The bankruptcy court concluded that "[t]o undo all of these transactions would cause incalculable harm to hundreds of people, at a staggering cost, for which no commensurate benefit would lie." 41 B.R. at 1005–06 n. 20. But the trustee's first theory must fail for an even more basic reason: The bankruptcy law does not sanction the relief sought.

■ Although in theory the most equitable resolution of these cases may well be for each undertaker to return all the money he received from the debtors so that the money could be redistributed pro rata, see Eby v. Ashley, 1 F.2d 971, 973 (4th Cir.1924), cert. denied, 266 U.S. 631, 45 S.Ct. 197, 69 L.Ed. 478 (1925), the bankruptcy court is a court of limited jurisdiction. As the bankruptcy court stated:

> The equitable powers of the bankruptcy court are limited by the express terms of the Code. A court of equity may not create totally new substantive rights under the guise of doing equity.... [I]n the absence of any statutory or judicial precedent, ... the court may not invoke its equitable powers to substantively enlarge the trustee's avoiding powers as urged in this case.

41 B.R. at 1005 (citations omitted). See also Johnson v. First Nat'l Bank of Montevideo, Minn., 719 F.2d 270, 273 (8th Cir. 1983), cert. denied, 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984), and cases cited therein.

The trustee has failed to direct us to any statutory or judicial precedent expressly authorizing the result he seeks.[19] Rather, he has cited two cases in which courts refused to allow investors in fraudulent investment schemes to recover more from the bankrupts' estates than they had invested. Official Cattle Contract Holders Comm. v. Commons (In re Tedlock Cattle Co.), 552 F.2d 1351 (9th Cir.1977); Abrams v. Eby (In re Young), 294 F. 1 (4th Cir. 1923).

Abrams arose out of the collapse of Young's fraudulent investment program. Abrams had invested a total of $4,000 in the program but had withdrawn $2,000 of his principal and had received fictitious profits of some $2,797 before the case arose. When Young went into bankruptcy, Abrams asserted a claim against the bankrupt estate for $2,000, the remainder of his original investment. The court disallowed the claim on equitable grounds, noting that Abrams had already received some $797 in excess of his original investment while other investors had received nothing.

Tedlock Cattle merely relied on Abrams in holding that the bankruptcy trustee could measure the claims of investors in a Ponzi scheme by their out-of-pocket loss rather than by the lost benefit of their bargain. The court concluded that the trustee could properly deny recovery for anticipated or "paper" profits investors had lost. In neither case was the trustee trying to recover money that the investors had already received.

It is one thing to say that the trustee can object to claims for more than one's original investment; in such a case, he is merely protecting the property of the estate. It is quite another thing to say that he can avoid what the investors might justifiably have believed was a legitimate transaction and recover the payments; in such a case, the trustee is exercising extraordinary powers to enlarge the bankruptcy estate. Those powers are conferred only by statute. Without such a statute, the trustee has no avoiding powers. The trustee's exercise of those powers is circumscribed by the very statute that creates them, and the statute in this case does not allow the trustee to recover all transfers made within a year of filing the bankruptcy petition, fraudulent or otherwise.

If the cited cases support the trustee's theory, they do so only to the extent that

19. Even were we to find for the trustee on his first theory, the result here would not be equitable. The trustee seeks relief against only some—not all—of the undertakers. He seeks only to recover transfers made within a year of the debtors' filing their bankruptcy petitions. Those who received payments before September 16, 1980, would still be able to keep them, thus profiting at the expense of other undertakers.

he seeks to recover fictitious *profits* (or "earnings") a defendant received. The court in *Abrams* said, "Equity ... requires that he [the investor] should account for all sums paid to him *as profit* before he can share with others in the application of the funds on hand to the debts due for sums actually paid in." 294 F. at 4 (emphasis added). It did not say that the investor would have to account for *everything* he had received, including any portion of his initial investment.

Thus, at best, *Abrams* and *Tedlock Cattle* support the trustee's second cause of action, not his third. In fact, in neither case were investors even required to give back fictitious profits they had received, let alone any part of their original investment.

## 2. *Section 548*

Our conclusion that the trustee's power to recover transfers is defined and circumscribed by statute brings us to the plaintiff's second theory, namely, that the transfers were avoidable under section 548 of the Code as fraudulent conveyances. Section 548 authorizes the trustee to avoid certain transfers "of an interest of the debtor in property" if they fall within two broad categories.[20] A conveyance may be "fraudulent" within the meaning of section 548 either (1) if it was made with an actual intent to hinder, delay, or defraud creditors—regardless of whether the transferor was insolvent at the time—or (2) if the transferor was insolvent (or likely to be-

come insolvent) and received "less than a reasonably equivalent value" in exchange for the transfer—regardless of the transferor's intent. *See* 11 U.S.C. § 548(a).[21] The trustee argues that the transfers he seeks to recover were fraudulent in both respects.

### a. *Section 548(a)(2)*

The trustee first argues that payments to the defendants were fraudulent under section 548(a)(2) because the debtors were insolvent when the transfers were made and "received less than a reasonably equivalent value in exchange for" the transfers. It is undisputed that the debtors were insolvent when they made the transfers, so the only question under section 548(a)(2) is whether the debtors received a reasonably equivalent value for the transfers.

Section 548 defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor." 11 U.S.C. § 548(d)(2)(A). The Code defines a "debt" as "liability on a claim," 11 U.S.C. § 101(11), and a "claim" includes any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured," *id.* § 101(4)(A).

The bankruptcy court concluded that all transfers to defendants "were payments on contractual debts" and hence "value" within the meaning of section 548. 41 B.R. 1007.[22]

---

**20.** We have already concluded that the transfers involved here were of "an interest of the debtor in property," so the threshold requirement of section 548 is met.

**21.** Section 548(a) provided in pertinent part:
The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor—
(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer occurred or such obligation was incurred, indebted; or
(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.
11 U.S.C. § 548(a) (1982). Section 548(a) was amended in 1984, but the 1984 amendments do not apply to these cases. *See supra* note 5.

**22.** Moreover, the bankruptcy court concluded that the debtors received "a reasonably equivalent value" for the transfers because "the monthly payments when aggregated did not exceed the amounts deposited with the debtors." 41 B.R. 1007.
The bankruptcy court's conclusion that no defendant received more than he "deposited" with the debtors is clearly erroneous. At least some defendants received more than they advanced to the clearinghouses. *See supra* note 18.

The trustee argues on appeal that each contract between a defendant and a debtor did not create a debt on the part of the debtor but rather gave the defendant an ownership interest in the debtor's business. *Cf. Payable Accounting Corp. v. McKinley*, 667 P.2d 15 (Utah 1983) (the contracts were "investment contracts" and hence securities within the meaning of Utah's securities law). Thus, he argues, any transfer to a defendant that came from other undertakers' money and not from actual profits could not have satisfied an antecedent debt and was therefore "fraudulent" within the meaning of section 548(a)(2) because not made for a "reasonably equivalent value." And since the debtors had no actual profits, all transfers to all defendants were fraudulent within the meaning of section 548(a)(2).[23]

■ We conclude that the debtors received a "reasonably equivalent value" in exchange for all transfers to a defendant that did not exceed the defendant's principal undertaking but, to the extent a defendant received more than he gave the debtors, the debtors did not receive a reasonably equivalent value.

From the time a defendant entrusted his money to the debtors, he had a claim against the debtors for the return of his money. We believe that the Code's definition of "debt" and its related terms is broad enough to cover the debtors' obligation to return a defendant's principal undertaking, whether that obligation was based on the contract between the debtors and the defendant or was based on the defendant's right to restitution.[24] *Cf. Cunningham v. Brown*, 265 U.S. 1, 13, 44 S.Ct. 424, 427, 68 L.Ed. 873 (1924) (investors in the original Ponzi scheme who could not trace their money were creditors of the debtor); *Rosenberg v. Collins*, 624 F.2d 659, 664 (5th Cir.1980) (investors in a Ponzi scheme whose total cash withdrawals were less than their total cash deposits were

creditors of the bankrupt); *Eby v. Ashley*, 1 F.2d 971, 973 (4th Cir.1924) (an investor in a fraudulent scheme had a right to recover his principal "from the moment that he was deceived into paying it"), *cert. denied*, 266 U.S. 631, 45 S.Ct. 197, 69 L.Ed. 478 (1925); *Lawless v. Anderson (In re Moore)*, 39 B.R. 571, 574 (Bankr.M.D.Fla. 1984) (investors in a Ponzi scheme "are general unsecured creditors to the extent of their losses"). Thus, to the extent the debtors' payments to a defendant merely repaid his principal undertaking, the payments satisfied an antecedent "debt" of the debtors, and the debtors received "value" in exchange for the transfers. Moreover, to the extent a transfer merely repaid a defendant's undertaking, the debtor received not only a "reasonably equivalent value" but the exact same value—dollar for dollar. We therefore hold that such transfers are not avoidable under section 548(a)(2).

Transfers in excess of a defendant's undertaking are another matter. The defendants argue that such transfers also satisfied an antecedent debt of the debtors. The only liability the debtors had for payments of so-called earnings was their contractual liability. Thus, whether the debtors were indebted to a defendant for amounts in excess of his undertaking depends on whether or not the defendant had a valid, enforceable right under his contract with the debtors to receive payments of so-called earnings.

■ The trustee has not argued that the contract between each defendant and the debtors was illegal or otherwise unenforceable on its face. Courts' refusals to enforce an illegal bargain generally rest on "the elementary principle that one who has himself participated in a violation of law cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction." *Gibbs & Sterrett Mfg. Co. v. Brucker*, 111 U.S. 597,

---

**23.** This is really just the trustee's corporate trust fund argument, discussed *infra* part IV–B–3–a, in another guise.

**24.** If there was not a valid contract between the debtors and a defendant, before the transfer the defendant would have had a claim for restitution, to prevent the debtors' unjust enrichment.

*See* Restatement of Restitution § 1 (1936). If there was a valid contract that gave the defendant an equity interest in the debtors' business, as the trustee contends, the defendant would still have had a right to restitution if the debtors' fraud induced him to enter into the contract. *See* Restatement (Second) of Contracts §§ 164 & 376 (1979).

601, 4 S.Ct. 572, 574, 28 L.Ed. 534 (1884). "The rule was conceived for the purposes of protecting the public and the courts from imposition." *Norwood v. Judd,* 93 Cal.App.2d 276, 209 P.2d 24, 31 (1949). For a court to lend its aid to a wrongdoing plaintiff is to lend its sanction to the wrong. However, if the party seeking enforcement is innocent of any violation, that reason for refusing to enforce the bargain does not apply. Thus, if a party enters into an illegal bargain and is justifiably ignorant of the facts creating the illegality or if he enters into a facially valid contract and is justifiably ignorant of the other party's illegal purpose, the innocent party may generally enforce the contract. *See* J. Calamari & J. Perillo, *The Law of Contracts* § 22–4 at 782–83 (2d ed. 1977); Restatement of Contracts § 599 (1932); *Oakes v. Guarantee Ins. Co.,* 573 S.W.2d 899, 902 (Tex.Civ.App.1978) (quoting *Graham v. Dean,* 144 Tex. 61, 188 S.W.2d 372 (1945)).

However, in some cases "the interest of the public, rather than the equitable standing of individual parties, is of determining importance." 14 S. Williston & W. Jaeger, *A Treatise on the Law of Contracts* § 1630A at 22–23 (3d ed. 1972) (quoting *Parish v. Schwartz,* 344 Ill. 563, 176 N.E. 757, 761 (1931)). We believe that this is such a case. To allow an undertaker to enforce his contract to recover promised returns in excess of his undertaking would be to further the debtors' fraudulent scheme at the expense of other undertakers.

 In determining whether a contract is unenforceable because it is against public policy, the court may look beyond the terms of the contract itself to the underlying facts. *Tri-Q, Inc. v. Sta-Hi Corp.,* 63 Cal.2d 199, 404 P.2d 486, 497, 45 Cal.Rptr. 878 (1965). It is undisputed that the debtors here had no legitimate source of earnings but were operating a Ponzi scheme. Therefore, any money that a defendant might recover in excess of his undertaking in an action on the contract could not come

from the debtors but would have to come from money that rightfully belonged to other, defrauded undertakers. Enforcement of a contract such as those involved here would therefore hurt the debtors' other creditors by depleting the pool of assets to which they could look for payment. *Cf. J.M. Deutsch Co. v. Robert Paper Co.,* 13 A.D.2d 768, 215 N.Y.S.2d 939 (contract to secretly prefer one creditor over others was contrary to public policy), *reargument and appeal denied,* 14 A.D.2d 531, 218 N.Y.S.2d 938 (1961).

Moreover, enforcement would further none of the policies generally favoring enforcement by an innocent party to an illegal bargain. It would not deter the debtors' fraudulent conduct because it would not hurt the debtors at all. Any recovery would not come from the debtors' own assets because they had no assets they could legitimately call their own. Rather, any award of damages would have to be paid out of money rightfully belonging to other victims of the Ponzi scheme.

One could argue that denying enforcement would unjustly enrich the debtors, but if they are enriched unjustly, it is because they are allowed to keep money that rightfully belongs to other creditors—not to the party seeking to enforce the contract. If the contract were enforced, the party who received the benefits of his contract would be unjustly enriched at the expense of other defrauded undertakers. In short, to enforce the contract as to fictitious profits would only further the debtors' fraudulent scheme.

 We therefore conclude that, as a matter of public policy, the contracts involved in this case were unenforceable to the extent they purported to give the defendants a right to payments in excess of their undertaking.[25] Consequently, transfers by the debtors to a defendant in excess of his undertaking did not satisfy an antecedent debt of the debtors.

---

**25.** This conclusion does not necessarily mean that the defendants did not have a contractual right to be repaid their principal. The parties' performances under the contract can arguably be apportioned into corresponding pairs of agreed equivalents: The consideration for the debtors' promise to repay a defendant's principal was the defendant's promise to entrust the principal to the debtors, and the consideration for the debtors' promise to pay "revenues" or earnings was the defendant's promise to let the debtors use his principal over a period of time. Because the first set of promises is not offensive to public policy, those promises could still be enforceable. *See* Restatement (Second) of Contracts § 183 (1979).

The transfers could still have been made for "value," however, if the debtors received "property" in exchange for the transfers. The consideration for the transfers was the use of the defendants' money over a period of time. The use of money may be "property" in some contexts. *See, e.g., Dickman v. Commissioner*, 465 U.S. 330, 336, 104 S.Ct. 1086, 1090, 79 L.Ed.2d 343 (1984) (for federal gift tax purposes the use of money "is itself a legally protectible property interest"). *See also Larrimer v. Feeney*, 411 Pa. 604, 192 A.2d 351, 354 (1963) (implying that transfers were not fraudulent to the extent they did not exceed the legal rate of interest). We conclude, however, that the use of investors' money to perpetuate a Ponzi scheme is not the type of "property" and hence "value" Congress had in mind when it passed section 548(a)(2).

█ "Value" must be determined by an objective standard. *See Pereira v. Checkmate Communications Co. (In re Checkmate Stereo & Elecs., Ltd.)*, 9 B.R. 585, 591 (Bankr.E.D.N.Y.1981). If the use of the defendants' money was of value to the debtors, it was only because it allowed them to defraud more people of more money. Judged from any but the subjective viewpoint of the perpetrators of the scheme, the "value" of using others' money for such a purpose is negative. *See also Lawless v. Anderson (In re Moore)*, 39 B.R. 571, 573 (Bankr.M.D.Fla.1984) (the court "would be hard pressed to determine what would constitute reasonably equivalent value" for transfers in furtherance of a Ponzi scheme). *But see Larrimer v. Feeney*, 192 A.2d at 354 (implying that transfers were not fraudulent to the extent they did not exceed the legal rate of interest).

█ In theory, the trustee is not allowed to avoid transfers made for reasonably equivalent value because creditors are not hurt by such transfers. *See 5 Debtor-Creditor Law* ¶ 22.03[D][1][b] (T. Eisenberg ed. 1986). If the debtor no longer has the thing transferred, either he has its equivalent, in which case his creditors can reach the equivalent to satisfy their claims, or his liabilities have been proportionately reduced. In either case, creditors have not been prejudiced. But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate. In ·such a situation, the use of the defendant's money cannot objectively be called "reasonably equivalent value." *Cf. Consove v. Cohen (In re Roco Corp.)*, 701 F.2d 978 (1st Cir.1983) (the debtor corporation received less than a reasonably equivalent value for redemption of its stock where redemption significantly increased its liabilities without adding to its assets); *Glosband v. Watts Detective Agency, Inc.*, 21 B.R. 963, 971 (D.Mass.1981) ("property" for purposes of the fraudulent conveyance statute incorporates "anything of value which but for the transfer might have been preserved for the trustee to the ultimate benefit of the bankrupt's creditors").

We therefore conclude that the debtors did not receive "value" in exchange for transfers to a given defendant to the extent the transfers exceeded the amount the defendant had advanced to the debtors. A fortiori, the debtors did not receive a "reasonably equivalent value" in exchange for those transfers. *Accord Eby v. Ashley*, 1 F.2d 971, 973 (4th Cir.1924), *cert. denied*, 266 U.S. 631, 45 S.Ct. 197, 69 L.Ed. 478 (1925); *Lawless v. Anderson (In re Moore)*, 39 B.R. 571, 573 (Bankr.M.D.Fla.1984). Such transfers may therefore be avoided under section 548(a)(2) unless the transferee has a good defense to the trustee's claim. *See infra* part IV–B–2–c.

*b. Section 548(a)(1)*

Our conclusion that transfers to a defendant that merely repaid his principal undertaking were made for a reasonably equivalent value and hence are not avoidable under section 548(a)(2) brings us to the trustee's next argument, namely, that such transfers are avoidable under section 548(a)(1). A transfer made for reasonably equivalent value can still be fraudulent and hence avoidable if it was made "with actual intent to hinder, delay, or defraud" persons to whom the debtor was or later became indebted. 11 U.S.C. § 548(a)(1). The bankruptcy court gave little attention to the trustee's claim that the payments to undertakers were fraudulent under section 548(a)(1), holding simply that "the trustee has not carried his burden of proof to show that the monthly payments to defendants

were made with such actual intent." 41 B.R. at 1007. We disagree.[26] We conclude that the debtors' intent to hinder, delay or defraud was established as a matter of law.

Our role in an appeal from the grant or denial of summary judgment is to determine whether there was a genuine issue of material fact and, if not, whether the moving party was entitled to a judgment as a matter of law. 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2716 at 643 (2d ed. 1983). Although intent is often a disputed factual question, we conclude that in this case there was no genuine issue of material fact concerning the debtors' intent to hinder, delay or defraud creditors.

The evidence before the bankruptcy court on the question of the debtors' intent consisted of the affidavit of Ron N. Bagley, the original trustee and trustee Merrill's accountant. That evidence shows that the debtors conducted no business operations, never generated any profits or earnings, paid all monthly disbursements to undertakers solely from other undertakers' investments, were insolvent from the moment the first investment contract was executed, became more insolvent with each successive contract, and ran their business as a Ponzi scheme. In addition, the Bagley affidavit sets out fourteen material representations—many of them allegedly false—that the debtors made regarding the nature of their business and the nature of the investments to induce undertakers to invest in the program. None of the defendants introduced any evidence to dispute the assertions in the Bagley affidavit. Thus, it was undisputed that the debtors' business "was conducted as a 'Ponzi' scheme...." 41 B.R. at 994.

To be fraudulent under section 548(a)(1) a transfer need not be made with the intent to hinder, delay or defraud the transferee. The trustee need only show that the transfers were made with the intent to hinder, delay or defraud "any entity to which the debtor was *or became* [indebted], on or *after the date that such transfer occurred.*" 11 U.S.C. § 548(a)(1) (emphasis added). Those persons who invest on the eve of a Ponzi scheme's collapse are enti-

ties to whom the debtor becomes indebted when they entrust their money to the debtors. Therefore, if at the time the debtors made transfers to earlier undertakers they had the actual intent to hinder, delay or defraud later undertakers, transfers to earlier undertakers may be fraudulent within the meaning of section 548(a)(1).

■ One can infer an intent to defraud future undertakers from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf.* Restatement (Second) of Torts § 8A (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.),* 14 B.R. 637, 643 (Bankr. D.Kan.1981) (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1)).

■ Although the question of the debtors' intent would ordinarily present a factual question, we conclude that, from the undisputed evidence in the record, only one inference is possible—namely, that the debtors had the intent to hinder, delay or defraud creditors. The trustee's undisputed evidence is that the debtors were engaged in a Ponzi scheme and therefore must have known that undertakers at the end of the line would lose their money. That is the only evidence there is. We conclude that it was sufficient to establish, as a matter of law, the debtors' actual

---

**26.** Even were we to agree with the bankruptcy court on this issue, that court's conclusion would not support its grant of summary judg-

ment for the defendants on the trustee's third claim but would at best raise an issue of fact to be resolved at trial.

intent to hinder, delay or defraud creditors within the meaning of section 548(a)(1). *Cf. Conroy v. Shott* 363 F.2d 90, 91–92 (6th Cir.) (quoting with approval from the opinion of the district court, which granted the trustee's motion for summary judgment and concluded that "the question of intent to defraud is not debatable" given the fact that the debtor was carrying on a Ponzi scheme), *cert. denied,* 385 U.S. 969, 87 S.Ct. 501, 17 L.Ed.2d 433 (1966).

#### c. Section 548(c)

The bankruptcy court concluded that, even if the debtors had the actual intent to hinder, delay or defraud, section 548(c) made the defendants "immune" from the trustee's power to avoid fraudulent conveyances under section 548. 41 B.R. at 1007.

Section 548(c) provided:

> Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on any interest transferred, may retain any lien transferred, or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.[27]

In other words, even if the payments to the defendants were fraudulent conveyances, the defendants are protected, to the extent they gave the debtors "value" in exchange for the transfers, if they took the money in "good faith."[28]

The extent to which a defendant "gave value" for a particular transfer is essentially the flip side of the question we have already discussed under section 548(a)(2), namely, whether the debtor received a "reasonably equivalent value" in exchange for the transfer. What the defendants gave the debtors in exchange for transfers in excess of their undertaking was the use of their money to further a Ponzi scheme. For the reasons previously stated, we conclude that what the defendants gave the debtors in exchange for such transfers was not "value" within the meaning of section 548. Therefore, to the extent the trustee seeks to recover transfers in excess of a defendant's undertaking, section 548(c) provides no defense.

On the other hand, we have also concluded that, to the extent transfers to a defendant did not exceed the amount of the defendant's undertaking, the debtor received a "reasonably equivalent value" for the transfer. The converse is also true: To the extent that a defendant received amounts less than or equal to his undertaking, he "gave value" to the debtor in exchange for the transfers. The consideration for the transfers was satisfaction of the debt created when the defendant advanced the debtor money or other property, and, under section 548(d), satisfaction of an antecedent debt is "value."

Our conclusion that the defendants "gave value" for transfers that merely repaid their undertaking brings us to the question of whether they also took the transfers in good faith. If they did, section 548(c) protects them from the trustee's power to avoid those transfers under section 548.

This court is troubled with the bankruptcy court's blanket finding, unsupported by the record, that all defendants took in good faith.

The Code does not define "good faith." Courts, however, have defined it in various ways. *Compare, e.g., Gilmer v. Woodson (In re Decker),* 332 F.2d 541, 547 (4th Cir. 1964) (good faith not lacking "unless the transferee knowingly participated in the debtor-transferor's purpose to defeat other creditors or lacked good faith in valuing the property exchanged"), *with In re Windor Indus., Inc.,* 459 F.Supp. 270, 279 (N.D. Tex.1978) (good faith under former 11 U.S.C. § 107 "is not present where the transferee at the time of the transaction had knowledge of facts sufficient to put him on inquiry as to the insolvency or possible insolvency of the debtor"). *See generally* 4 *Collier on Bankruptcy* ¶ 548.-07[2] at 548–68 & nn. 10–13 (L. King 15th ed. 1987) and cases cited therein.

The construction to be put on the phrase "in good faith" may depend in large part on the facts as they develop. *See Boatman v. McMillan Mach. Co. (In re Bristol Indus. Corp.),* 45 B.R. 606, 609 (Bankr.D. Conn.1985). Certainly, if a defendant knew that the debtor was running a Ponzi scheme when he advanced money to the debtor or knew of the debtor's insolvency at the time of the allegedly fraudulent

---

**27.** The 1984 amendments revised section 548(c) slightly, but the amendments do not apply to these cases. *See supra* note 5.

**28.** Of course, section 548(c) provides no defense to the trustee's claims based on provisions of the Code other than section 548.

transfer, that knowledge might indicate a lack of good faith. *See* 4 *Collier on Bankruptcy, supra,* at ¶ 548.07[2]; *see also Seligson v. New York Produce Exch.,* 394 F.Supp. 125, 133 (S.D.N.Y.1975) ("if the transferee had knowledge of the unfavorable financial condition of the transferor at the time of the transfer, it could not meet the good faith requirement" of former 11 U.S.C. § 107(d)(2)); *Consumers Credit Union v. Widett (In re Health Gourmet, Inc.),* 29 B.R. 673, 677 (Bankr.D.Mass.1983) (transferee's knowledge of the debtor's insolvency "is equivalent to lack of good faith" under § 548(c)). "Indeed, the presence of any circumstance placing the transferee on inquiry as to the financial condition of the transferor may be a contributing factor in depriving the former of any claim to good faith unless investigation actually disclosed no reason to suspect financial embarrassment." 4 *Collier on Bankruptcy, supra,* at 548–68.

The test is whether the transaction in question bears the earmarks of an arm's length bargain. *Bergquist v. First Nat'l Bank (In re American Lumber Co.),* 5 B.R. 470, 477 (D.Minn.1980). The mere fact that the debtors promised exorbitant returns on a defendant's investment, however, does not, without more, mean that the defendant lacked good faith. If a legitimate accounts payable factoring program could have supported the promised rate of return, the promised rate of return may not have put the defendant on notice of the debtors' fraud. Moreover, because the debtors paid the promised returns, at least initially, a defendant may have had no reason to suspect that the debtors were insolvent. *Cf. Cunningham v. Merchants' Nat'l Bank (In re Ponzi),* 4 F.2d 25, 29 (1st Cir.) (the fact that Ponzi "had, so far, kept his agreements with the bank" belied any knowledge by the bank that Ponzi was insolvent or was running an illegitimate business), *cert. denied,* 268 U.S. 691, 45 S.Ct. 511, 69 L.Ed. 1160 (1925).

The bankruptcy court itself noted, on the issue of the debtors' intent to defraud, that "[a]s a general proposition ... summary judgment is inappropriate when issues of motive, intent, and other subjective feelings are material." 41 B.R. at 1007. We feel that the same approach should be taken on the subjective question of whether the defendants took in good faith. From the record it appears that no evidence was taken on this particular question. Thus, this court is unable to determine the basis for the bankruptcy court's finding.[29]

We conclude that a defendant's good faith (or lack thereof) was a genuine issue of material fact. Because the bankruptcy court took no evidence on the issue, it erred in granting summary judgment for the defendants on the trustee's third claim. We therefore remand to the bankruptcy court for factual findings on the question of whether the defendants took payments that did not exceed their principal undertaking in good faith.

### 3. Section 544(b)

The last theory by which the trustee sought to recover all payments that the debtors had made within a year of filing for bankruptcy was that the transfers were avoidable under state law and hence were avoidable under section 544(b) of the Code.

Section 544(b) authorizes the trustee to avoid "any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an

**29.** The record shows certain facts from which the bankruptcy court might have drawn an inference that the defendants took in good faith. Those facts include the existence of a Ponzi scheme, false representations by the debtors that were meant to induce reliance, and "undertakings" by the defendants, from which one might infer actual reliance. In other words, the bankruptcy court might have inferred from the mere fact of the defendants' undertakings that the defendants were defrauded, since the debtors' intent in soliciting the undertakings was to defraud them.

The bankruptcy court may also have concluded that the undertakers generally were unsophisticated in investment matters, from the modest amounts some of the defendants advanced, by the jobs some held (as reflected in their answers to interrogatories) and by the fact that many of the defendants appeared pro se, suggesting either that they could not afford a lawyer or did not realize the need for one. The fact that the defendants received payments under their contracts may have allayed any suspicions they had that the debtors were not carrying on any business. We believe that, at best, these facts would raise a genuine issue of material fact and would not support the bankruptcy court's finding of good faith as a matter of law, especially as applied indiscriminately to every defendant. It is possible that at least some of the defendants knew that the clearinghouses were not running a legitimate business. (One might wonder, for example, about the good faith of an investor called "Pyramid Trust.")

unsecured claim...." [30] The "applicable-law" for determining the rights of an unsecured creditor to avoid a transfer is state law.[31] *See, e.g., Hunts Point Tomato Co. v. Roman Crest Fruit, Inc. (In re Roman Crest Fruit, Inc.)*, 35 B.R. 939, 947 (Bankr. S.D.N.Y.1983). The trustee argues that, under the applicable Utah law, an unsecured creditor could have avoided all transfers made to investors within a year of filing. He suggests two different grounds: First, he argues, the transfers were avoidable under the corporate trust fund doctrine. Second, he argues, they were avoidable under the Utah Fraudulent Conveyance Act, Utah Code Ann. §§ 25–1–1 through –16 (1984).

### a. The corporate trust fund doctrine

██ The corporate trust fund doctrine is a judicially created doctrine that allows a corporation to recover disbursements to equity holders made when there were no profits out of which a dividend could lawfully be declared. Restitution may be enforced by the corporation, by stockholders, by creditors of the corporation and by a trustee in bankruptcy. 12 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 5422 at 91 (rev. perm. ed. 1985)

(citations omitted). The rationale for the doctrine is that the corporation's

> capital is a fund held by the corporation in trust for the payment of its debts, and that the money received for dividends, being in fact capital, is impressed with this trust, and that "he who has received moneys impressed with a trust, without consideration, ought to and must restore them."

*Id.* at 91–92 (quoting *Hayden v. Thompson*, 71 F. 60, 66 (8th Cir.1895)). The doctrine is premised on the idea that a corporation's creditors should have recourse to the corporation's capital for repayment of their claims "since it [was] upon the faith of the corporation's capital stock and assets which the law presumes that credit was given...." 15A *id.* § 7371 at 52 (rev. perm. ed. 1981).

The doctrine—or at least its rationale—has been widely repudiated. *See, e.g., McDonald v. Williams*, 174 U.S. 397, 401–05, 19 S.Ct. 743, 744–46, 43 L.Ed. 1022 (1899) (no trust fund at least where corporation is solvent); *Central Hanover Bank & Trust Co. v. United Traction Co.*, 95 F.2d 50, 55 (2d Cir.1938); *Hospes v. Northwestern Mfg. & Car Co.*, 48 Minn. 174, 50 N.W. 1117, 1119–20 (1892). *See generally* 15A

---

**30.** As a prerequisite to recovering under section 544(b), the trustee must show "that at least one of the present creditors of the estate, holding an allowable claim, was an actual unsecured creditor or the successor in interest of an actual unsecured creditor against whom the transfer was fraudulent and voidable under the controlling state or federal law." 4 *Collier on Bankruptcy* ¶ 544.03[1] at 544–20 (L. King 15th ed. 1987). *Cf.* 11 U.S.C. § 544(a) (the trustee has the status of a hypothetical judgment lien creditor, regardless of whether such a creditor exists). Such a showing is not explicit in the record on appeal, although Professor Bagley's affidavit lists some 924 investors who deposited sums with the debtors after June 12, 1981, and received no returns. *See* Bagley affidavit ¶ 30 & ex. F. Presumably, they would be unsecured creditors of the debtors. The bankruptcy court may have to determine on remand, consistent with the legal conclusions expressed in this opinion, whether any of them hold allowable claims and whether they could avoid under the controlling state law the transfers the trustee seeks to avoid under section 544(b).

**31.** The question naturally arises as to which state's law applies. To the extent that nonbankruptcy law determines the trustee's avoiding powers, courts generally look to the law of the situs of property at the commencement of the

case. *See* 4 *Collier on Bankruptcy* ¶ 544.02 at 544–13 &-14 (15th ed. 1987). Here, the property (money that the debtors transferred to the defendants) was not all situated in one state but was spread throughout many states. Under such circumstances, this court may not be free simply to apply the law of the forum state to all claims. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816–23, 105 S.Ct. 2965, 2977–81, 86 L.Ed.2d 628 (1985). However, all parties have treated Utah law as the applicable law in these adversary proceedings and may be deemed to have acquiesced in its application, if not consented to it. Even if the parties were to contend that the law of another state applies, which they do not, the contention was not raised in the court below and hence need not be considered on appeal. *Kenai Oil & Gas, Inc. v. Department of the Interior*, 671 F.2d 383, 388 (10th Cir.1982). Moreover, even assuming that another jurisdiction's law would apply, none of the parties has shown us how the law of another jurisdiction differs from Utah law, a prerequisite to any claim that the bankruptcy court erred in applying Utah law. *See Phillips Petroleum*, 472 U.S. at 816, 105 S.Ct. at 2977 ("There can be no injury in applying Kansas law if it is not in conflict with that of any other jurisdiction connected to this suit"). We shall therefore treat Utah law as the governing law where state law applies and where there are Utah statutes or cases on point.

W. Fletcher, *supra,* § 7369 at 43 & 47 n. 2, § 7385 at 74 & 75 n. 1. The defendants argue that Utah does not recognize the doctrine, at least absent its codification, *see Passow & Sons v. Wetherbee,* 50 Utah 243, 167 P. 350, 351 (1917), and imply that the Utah Business Corporation Act is not such a codification, *see, e.g.,* Utah Code Ann. § 16–10–93 (1973) (procedure in liquidation of corporation by court).

Regardless of whether Utah law would recognize the doctrine, the plaintiff's argument must fail. We simply find the doctrine inapplicable under the facts of this case.

For the trust fund doctrine to apply here, the debtors (Massachusetts trusts) must be deemed "corporations," the defendants "shareholders" in those corporations, and their undertakings "capital" of the corporation. Even if the debtor enterprises could be considered "corporations" for purposes of applying the corporate trust fund doctrine, a question we do not reach, their relationship to the defendants was that of debtor to creditor, not that of corporation to shareholder.[32] *Cf. Cunningham v. Brown,* 265 U.S. 1, 13, 44 S.Ct. 424, 427, 68 L.Ed. 873 (1924) (investors in the original Ponzi scheme were only creditors of the debtor); *Rosenberg v. Collins,* 624 F.2d 659, 664 (5th Cir.1980) (defrauded investors were creditors of the debtor); *Lawless v. Anderson (In re Moore),* 39 B.R. 571, 573 (Bankr.M.D.Fla.1984) (investors in a fraudulent scheme were creditors to the extent of their losses).

Although as a general rule certificate holders in a common-law or Massachusetts trust "stand in their relation to the trust as stockholders in a corporation" (that is, they are "equitable owners of the trust property"), *Bryan v. Welsh,* 72 F.2d 618, 620 (10th Cir.1934), there is no evidence that the defendants in this case were even certificate holders in the debtor trusts. Their relationship was defined by their individual contracts with the debtors and not by any ownership interest in the debtors. The contracts between the defendants and the debtor enterprises state:

> It is understood and agreed that First Party [the defendant] is not lending or investing the funds herein commited [sic] but ... is assuming the debt of ASC's clients to the extent of this commitment ... and that ASC assigns to First Party, through ICH, the right to the revenues to be paid by ASC's clients....

Bagley affidavit exhibit A ¶ 8. Thus, the objective intent of the parties, as expressed in the contract, was that the defendants would assume the debts of the debtors' clients in exchange for the right to receive revenues paid by the clients. In other words, the defendants were ostensibly buying accounts receivable, albeit indirectly, through the debtors. The holder of an account receivable is a creditor, not an owner of the debtor business.

Even assuming, however, that the defendants' relationship to the debtors in this case was analogous to that of a certificate holder to a common-law trust, we find that that relationship was a creditor-debtor relationship.

The nature of the relationship between certificate holders in a common-law trust

---

**32.** This court's holding in *Merrill v. Allen (In re Universal Clearing House Co.),* 60 B.R. 985 (D.Utah 1986), *see supra* part II, that the debtors are "corporations" within the meaning of § 101(8) and hence entitled to bankruptcy relief does not necessarily mean that they are corporations for all purposes. Different legal standards may apply in different contexts. For example, if the question is whether the bankruptcy court has jurisdiction over an entity, the cases suggest that we need consider only the entity's express purpose and what it is empowered to do—not what it actually does. *See Allen,* 60 B.R. at 992. *But cf. In re Gonic Realty Trust,* 50 B.R. 710, 713 (Bankr.D.N.H.1985) ("a trust must be found to be 'conducting a business' of some kind" to be considered a "business trust" under the Code). On the other hand, in determining whether the corporate trust fund doctrine applies we look at the substance of the relation-

ship between the entity and the alleged shareholders and not merely at its form. *Cf. Selected Investments Corp. v. Duncan,* 260 F.2d 918 (10th Cir.1958), *cert. denied,* 359 U.S. 914, 79 S.Ct. 584, 3 L.Ed.2d 576 (1959), discussed *infra.*

Similarly, the Utah Supreme Court's conclusion that a contract similar to those involved here was an investment contract and hence a security subject to the Utah Uniform Securities Act, *Payable Accounting Corp. v. McKinley,* 667 P.2d 15 (Utah 1983), does not necessarily make the defendants equivalent to shareholders in the clearinghouses for purposes of the corporate trust fund doctrine. A given contract may create a security for one purpose and create a creditor-debtor relationship for another purpose. Different legal standards may apply, depending on the purpose, and a difference in tests may dictate a difference in results.

and the trust depends on the facts of each case. *Selected Investments Corporation v. Duncan,* 260 F.2d 918 (10th Cir.1958), *cert. denied,* 359 U.S. 914, 79 S.Ct. 584, 3 L.Ed.2d 576 (1959). *Duncan* involved the reorganization of a corporation and a related common-law trust, known as Selected Investments Trust Fund. The corporation and trust fund filed a joint petition for reorganization under chapter X of the old bankruptcy act. Certain holders of certificates issued by the corporation and countersigned by the trustee of the trust fund intervened, asserting that they were creditors of the debtor entities. Other creditors sought to have the petition for reorganization dismissed on the grounds that the debtors were not insolvent. The insolvency of the trust fund turned on whether the certificate holders were creditors of the trust fund or beneficial owners of shares in the fund.

The relationship of the certificate holders to the trust fund appeared at first glance to be that of equity holders to a corporation. The trust indenture authorized the corporation to issue and sell certificates in multiples of $100. The certificates were labeled "Certificate-Bond," and near the top were the words "No. Shares——." The holders of the certificates received annual payments, which were called "dividends." The certificates could be redeemed in cash at any time after three years from the date they were issued, at the election of either the holder or the corporation. The corporation did not have to redeem the certificates at their face value. Rather, on redemption the holder was entitled to receive only his fractional share of the total value of the fund. 260 F.2d at 921-22.

Nevertheless, the Tenth Circuit rejected the argument that the certificate holders were "merely beneficial owners" of the fund and instead held that a creditor-debtor relationship existed between the certificate holders and the trust. Among the "characteristic earmarks" that distinguished the relationship from that of shareholders to a corporation were the sales practices and distribution policies of the debtors. The debtors' general practice in selling certificates was to tell investors that they were lending money, that they were receiving bonds with a fixed rate of return and that after three years they could cash in the certificates at face value. The corporation treated the annual payments to investors as interest payments. The payments were consistently made, at a fixed rate and without regard to fluctuations in earnings or losses. Some were made out of capital. Despite the terms of the trust indenture, matured certificates were redeemed in cash at face value, without any attempt to determine the holder's distributive share of the trust's assets. *Id.* at 922. All of these facts

> had the effect of creating the relationship of debtor and creditor between the Corporation and the Trust Fund on one hand, and the holders of certificates on the other hand, rather than that of the holder of certificates merely owning interests in or shares of the assets of the Trust Fund.

*Id.* at 923.

The facts here present even a stronger case for finding that the undertakers are creditors of the debtors and not shareholders. Here the relationship between the debtors and defendants has none of the indicia of a shareholder-corporation relationship. It does not appear from the record that the defendants had any right to vote for the officers or trustees of the trusts, any right to compel the calling of stockholders' meetings, any voice in adopting by-laws or making fundamental changes in the trusts, any right to examine the books and records of the trusts or any right to sue as a representative of the trusts. According to the express terms of their contracts, the defendants were not even investing money in the trusts and thus could not be expected to share in the trusts' gains and losses.

As in *Duncan,* the debtors represented that the defendants would be paid regularly at a fixed rate, and until the enterprises collapsed the payments were consistently made at that rate, without regard to any earnings. The defendants could cancel their commitment at any time on thirty-days' written notice and receive payments at seventy-five percent of the contract rate. The defendants' relationship to the debtors was a contractual one—essentially that of a creditor and not that of an owner. Thus,

the defendants were not shareholders of the debtors, the payments they received were not "dividends,"[33] and the corporate trust fund doctrine does not apply.[34]

Because the trust fund doctrine does not apply under the facts of this case, it cannot provide a basis for the exercise of the trustee's avoiding powers under section 544(b).

### b. The Utah Fraudulent Conveyance Act

The plaintiff's second argument for avoiding the transfers under section 544(b) is that an unsecured creditor could avoid them under the Utah Fraudulent Conveyance Act, Utah Code Ann. §§ 25-1-1 through -16 (1984), which is based on the Uniform Fraudulent Conveyance Act and parallels in many respects section 548 of the bankruptcy code.

Sections 25-1-15 and -16 of the Utah Code allow an unsecured creditor to have a conveyance set aside to the extent necessary to satisfy his claim if the conveyance was fraudulent as to him. *See also* Utah Code Ann. § 25-1-1 ("creditor" defined). Sections 25-1-4 through -7 define the circumstances under which a conveyance is "fraudulent" as to creditors. The party seeking to set aside a conveyance as fraudulent has the burden of proving each element of a fraudulent conveyance by clear and convincing evidence. *Furniture Mfrs. Sales, Inc. v. Deamer*, 680 P.2d 398, 399 & 400 n. 10 (Utah 1984).

The first type of conveyance that is fraudulent under the Utah Fraudulent Conveyance Act is one made "with actual intent, as distinguished from intent pre-sumed in law, to hinder, delay or defraud either present or future creditors...." *Id.* § 25-1-7.

The trustee argues that the transfers to investors were made with actual intent to defraud at least later investors and hence were fraudulent conveyances under section 25-1-7. The bankruptcy court concluded that the trustee had not met his burden of proving actual intent to defraud, despite the admittedly fraudulent nature of the scheme. For the reasons discussed above in connection with section 548(a)(1) of the Code, we hold that the debtors' fraudulent intent is established as a matter of law, notwithstanding the trustee's higher burden of proof under the Utah statute.

The defendants argue that, even if the debtors made the transfers with an actual intent to defraud, the defendants come within the bona fide purchaser exception of section 25-1-13. That section states:

> The provisions of this chapter [the Utah Fraudulent Conveyance Act] shall not be construed to affect or impair the title of a purchaser for a valuable consideration, unless it appears that such purchaser had previous notice of the fraudulent intent of his immediate grantor, or of the fraud rendering void the title of such grantor.

Section 25-1-13 provides an exception similar to that of section 548(c) of the bankruptcy code. To avail himself of it, each defendant must show (1) that he was "a purchaser for a valuable consideration" and (2) that he did not have "previous notice of the fraudulent intent" of the debtors "or of the fraud rendering void" the debtors' title to the property conveyed.

---

**33.** The trustee's accountant seems to recognize this fact in his affidavit. He states that the payments to at least some of the defendants "were made on account of debts owed to said defendants pursuant to the 'undertaker' contracts...." Bagley affidavit ¶ 26. If the payments were the payment of a debt, they could not also be dividend payments.

**34.** The trust fund doctrine may also fail for another reason. When stockholders' liability is based merely on the depletion of the corpora-tion's capital, the stockholder must have had notice of the wrongdoing. *See* 15A W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 7371 at 54 n. 13 (rev. perm. ed. 1981) (citation omitted). The defendants here may have had no reason to know that the payments they received came from "capital" rather than from the clearinghouses' earnings. At best, the defendants' good faith in accepting payments raises a factual question precluding summary judgment. *See supra* part IV-B-2-c.

The threshold question under section 25–1–13 is whether the defendants were "purchasers" of the allegedly fraudulent transfers. We hold that they were. The Utah Supreme Court has never construed the term "purchaser" as used in section 25–1–13, but this court believes that, consistent with the definition of "purchaser" in similar contexts, the Utah Supreme Court would read the term broadly to include anyone who acquires title to property through a voluntary transfer. *See, e.g.,* 11 U.S.C. § 101(35) (Supp. III 1985) (a "purchaser" within the meaning of the Code is any "transferee of a voluntary transfer"); U.C.C. § 1–201(32) & (33) (1972) (a "purchaser" is any person who takes by "any ... voluntary transaction creating an interest in property"). *Compare Wright v. Sampter,* 152 F. 196, 199 (S.D.N.Y.1907) (the defendant was a "purchaser" within the old Bankruptcy Act's good-faith purchaser provision "because she acquired the payment to her otherwise than by descent"), *with Giustina v. United States,* 190 F.Supp. 303, 309 (D.Or.1960) (the legal meaning of "purchaser" is "one who, for a valuable consideration, acquires property or an interest in property"), *aff'd,* 313 F.2d 710 (9th Cir.1962). The defendants acquired their interest in the money the trustee seeks to recover by voluntary transfer from the debtors. We therefore hold that each defendant who received a transfer from the debtors was a "purchaser" within the meaning of section 25–1–13 of the Utah Code.

The next question is whether the defendants were purchasers "for a valuable consideration." Although the phrase "valuable consideration" is not expressly defined in the statute, the concept is similar to the concept of "value" in section 548 of the Code. We conclude that the term "consideration" includes both a conveyance of "property" and satisfaction of an antecedent debt. *Cf.* Utah Code Ann. § 25–1–3 ("fair consideration" includes both a con-

veyance of property and satisfaction of an antecedent debt); 11 U.S.C. § 548(d)(2)(A) ("value" means "property" or satisfaction of a present or antecedent debt). For the reasons previously discussed in part IV–B–2 of this opinion, we conclude that a defendant gave "valuable consideration" for the transfers he received to the extent the transfers did not exceed his undertaking. Such transfers satisfied the debtor's obligation to repay the undertaking. However, for the reasons previously discussed we also conclude that a defendant did not give valuable consideration for a transfer to the extent the transfer exceeded the amount of his undertaking. Therefore, for such transfers, section 25–1–13 is no defense.

The final issue under section 25–1–13 is whether the defendants had notice of the debtors' fraud or fraudulent intent. The bankruptcy court held that, as a matter of law, the defendants "took their payments for value and in good faith," 41 B.R. at 1007.

As previously discussed, the bankruptcy court's finding on the defendants' good faith was not supported by the record. These adversary proceedings must therefore be remanded for a factual determination on the question of whether a given defendant had "previous notice" of the debtors' fraud or fraudulent intent at the time he received each transfer the trustee seeks to avoid.[35]

Under the Utah Fraudulent Conveyance Act, a conveyance can also be fraudulent—regardless of the actual intent of the person making the conveyance—if the following conditions are met:

 1. The conveyance must have been made without fair consideration, and

---

**35.** Of course, if an undertaker actually knew that the money he received came from other undertakers and not from the proceeds of a legitimate business, he would have had previous notice of the debtors' fraud. But actual knowledge is not required under the Utah statute. "It is notice, not knowledge, that the [defendant] must have, and it need not be actual notice—constructive notice is sufficient to defeat [his]

claim." *Meyer v. General Am. Corp.,* 569 P.2d 1094, 1097 (Utah 1977). The mere fact that an investment promises to pay a high rate of return, however, may not without more put one on notice that it is fraudulent. So that fact alone may not mean that the defendants had previous notice of the debtors' fraud, especially when the debtors actually paid the promised returns until the scheme collapsed.

2. The person making the conveyance must have—

a. been insolvent at the time he made the conveyance or was rendered insolvent by the conveyance, Utah Code Ann. § 25–1–4, or

b. been engaged in or been about to engage in a business for which his remaining property would be an unreasonably small capital, *id.* § 25–1–5, or

c. intended to or believed that he would incur debts beyond his ability to pay as they matured, *id.* § 25–1–6.

It is undisputed that the debtors were insolvent when they made the conveyances to the defendants. However, the defendants argue that the payments to them were not constructively fraudulent and hence do not come within sections 25–1–4 through –6 because they were made for "fair consideration."

Under Utah law, "[f]air consideration is given for property" when, among other things, "in exchange for such property ... as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied...." *Id.* § 25–1–3. We have already concluded that, to the extent the transfers to a defendant exceeded a defendant's earnings, the consideration for the transfer was not "a fair equivalent." Thus, such transfers were not made for "fair consideration." On the other hand, we have also held that transfers to a defendant that merely repaid the defendant's undertaking satisfied an antecedent debt of the debtor. Such transfers were also a "fair equivalent" for the debt satisfied.

If that were all that the statute required, we would hold that conveyances to a defendant that merely repaid his principal undertaking were made for "fair consideration." But, unlike the fraudulent convey-ance provision of the federal bankruptcy code, the Utah statute also requires "good faith." [36] A conveyance will fail for lack of "fair consideration" if the party seeking to avoid the conveyance can show that the transferee did not take "in good faith." *Meyer v. General Am. Corp.,* 569 P.2d 1094, 1096 (Utah 1977).

Courts and commentators have not always agreed on the content of the good faith requirement under state fraudulent conveyance statutes. One court, for example, has found that a transferee does not take in good faith if he lacks an "honest belief in the propriety of the activities in question," has an actual intent "to take unconscionable advantage of others," or either intends to hinder, delay or defraud others or knows that the conveyance will have such an effect. *Sparkman & McLean Co.,* 4 Wash.App. 341, 481 P.2d 585, 591 (1971) (quoting *Tacoma Ass'n of Credit Men v. Lester,* 72 Wash.2d 453, 458, 433 P.2d 901, 904 (1967)). *See also Cady v. Johnson,* 671 P.2d 149, 151 (Utah 1983) (quoting with approval this definition of "good faith" in another context). On the other hand, at least one commentator has argued for a "participation" test, which would attribute bad faith to a creditor only if he obtained the payment for reasons other than protecting the value of his claim. Note, *Good Faith and Fraudulent Conveyances,* 97 Harv.L.Rev. 495 (1983). *Cf.* 4 *Collier on Bankruptcy* ¶ 548.07[2] at 548–68 & nn. 10–13 (L. King 15th ed. 1987) (discussing "good faith" under § 548(c)). It is not for this court to decide in the first instance how the definition of good faith in section 25–1–3 differs from the good faith requirement of section 548(c) of the Code, if at all. We simply hold that the defendants' good faith or lack thereof raises a genuine issue of material fact that the bankruptcy court may have to resolve on remand.[37]

If a defendant did not receive payments in good faith, then he did not give "fair

---

**36.** The old Bankruptcy Act of 1898 contained a similar provision in § 67d(1)(e). *See* 11 U.S.C. § 107d(1)(e) (repealed 1978). *See also Cohen v. Sutherland,* 257 F.2d 737, 742 (2d Cir.1958) ("fair consideration" under the act "requires both a fair equivalent and good faith").

**37.** Of course, if the bankruptcy court determines that the defendants did not receive payments from the debtors in "good faith" within the meaning of 11 U.S.C. § 548(c), it need not reach the question of whether the good faith requirement under Utah law differs from the Code's requirement.

consideration" for the payments within the meaning of the Utah statutes. On the other hand, if he did receive the money in good faith, not only may the court find that he gave "fair consideration" for the payments he received, but it may also find that he comes within the bona fide purchaser exception of section 25–1–13 even though the debtors made the payments with the actual intent to hinder, delay or defraud other creditors.

For the reasons stated above, we must remand these cases to the bankruptcy court to determine each defendant's good faith (or lack thereof) under section 25–1–3 and to determine his lack of notice under section 25–1–13. If the bankruptcy court finds that a defendant did not take in good faith, then the trustee may be able to recover all transfers to that defendant under section 544(b) of the Code and the applicable Utah law. On the other hand, if the bankruptcy court finds that a defendant received payments in good faith, the trustee may still be entitled to recover a portion of those payments, either as fraudulent conveyances or as preferential transfers. We will therefore discuss the trustee's other claims to aid the bankruptcy court with its disposition of the case on remand.

### C. The Trustee's Second Claim

Under his second claim, the trustee sought to avoid as fraudulent conveyances all transfers to undertakers in excess of their undertaking, that is, all payments of fictitious profits. The bankruptcy court granted the trustee's motion for summary judgment on his second claim, ruling that, as a matter of law, "the debtors received less than a reasonably equivalent value in exchange for these transfers." 41 B.R. at 1009.

We have already rejected the defendants' argument that the transfers were not "of an interest of the debtor in property" and hence not avoidable under section 548. *See supra* part IV–A.[38] Moreover, we have also concluded, in part IV–B–2, that the debtors made the transfers with the actual intent to defraud creditors and that the debtors received less than a reasonably equivalent value in exchange for the transfers to the extent transfers to a given defendant exceeded his undertaking. The defendants do not dispute that the transfers occurred within one year before the debtors filed their petitions in bankruptcy at a time when the debtors were insolvent. Thus, we hold that the transfers are avoidable under section 548(a).[39] Furthermore, we have also held that, to the extent a defendant received more than he entrusted to the debtors, section 548(c) does not present a possible defense to the trustee's actions. In short, the bankruptcy court correctly granted the trustee's motion for summary judgment on his second claim.

Case law supports the bankruptcy court's conclusion that payments of fictitious profits to investors in a Ponzi scheme are not made for a reasonably equivalent value and thus are avoidable as fraudulent conveyances. *See Eby v. Ashley*, 1 F.2d 971 (4th Cir.1924), *cert. denied*, 266 U.S. 631, 45 S.Ct. 197, 69 L.Ed. 478 (1925); *Lawless v. Anderson (In re Moore)*, 39 B.R. 571 (Bankr.M.D.Fla.1984). *See also Rosenberg v. Collins*, 624 F.2d 659 (5th Cir.1980) (affirming the decision of the district court, which found that transfers in excess of a defendant's total cash deposits were without "fair consideration" within the meaning of old 11 U.S.C. § 67(d)(1)(c)); *Larrimer v. Feeney*, 411 Pa. 604, 192 A.2d 351 (1963) (transfers in excess of a defendant's invest-

---

**38.** One might seriously question the standing of these defendants to raise the issue in the first place. To paraphrase the words of another court faced with a similar argument in a similar case, if the money did not belong to the debtors it must belong to those who would at this point have been its rightful owners had bankruptcy not intervened, i.e. to those investors from whose funds the [defendants'] "profits" derived. The [defendants], as far as we can discern, [are] not claiming to hold the funds for the benefit of those who received less than they paid in; we must presume that [they want] to keep them. As matters now stand, [the defendants are beneficiaries] rather than [victims] of the [debtors'] fraudulent course of conduct.

*Lawless v. Anderson (In re Moore)*, 39 B.R. 571, 574 (Bankr.M.D.Fla.1984).

**39.** For the text of section 548(a), see *supra* note 21.

ment plus the legal rate of interest were without fair consideration under the Pennsylvania fraudulent conveyance act). The defendants have cited no cases holding to the contrary.

The law allowing a trustee to avoid payments of fictitious Ponzi scheme profits as fraudulent conveyances embodies the principal that no one should profit from a fraudulent scheme at the expense of others. Were the defendants allowed to keep payments in excess of their undertakings, they would be profiting at the expense of those who entered the scheme late and received little or nothing. The fortuity that these defendants got into the scheme early enough to make a profit should not entitle them to a reward at the expense of equally innocent undertakers who entered the scheme later, perhaps as a result of misplaced faith borne of prior undertakers' success. On the other hand, if the trustee is allowed to avoid transfers of fictitious profits the defendants are not hurt but will be in roughly the same position they were in before they entrusted their money to the debtors. They will still have all the funds that they invested (subject, of course, to the trustee's third claim on remand). We therefore hold that, to the extent the defendants received more than their undertaking, the debtors did not receive a reasonably equivalent value in exchange for the transfers, the defendants did not give value in exchange for the transfers, and the trustee can avoid the transfers under section 548(a)(2), as well as under section 548(a)(1).

### D. The Trustee's First Claim

Under his first claim the trustee sought to recover as preferential all transfers made within ninety days of the debtors' petitions in bankruptcy under section 547 of the Code.

Section 547(b) provided:
Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—
(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—
(A) on or within 90 days before the date of the filing of the petition; ... [and]

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.
11 U.S.C. § 547(b) (1982).[40]

The purpose of section 547 is twofold: It is meant to discourage creditors "from racing to the courthouse to dismember the debtor during his slide into bankruptcy" and to further the fundamental bankruptcy policy of treating creditors equally by preventing a debtor from preferring one creditor over others on the eve of bankruptcy. H.R.Rep. No. 595, 95th Cong., 1st Sess. 177–78 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6138.

Under the old preference statute, section 60b of the bankruptcy act, 11 U.S.C. § 96(b) (repealed 1978), the trustee could avoid a preferential transfer only if the creditor for whose benefit the transfer was made had reasonable cause to believe, at the time the transfer was made, that the debtor was insolvent. The requirement that the trustee prove the creditor's state of mind proved "nearly insurmountable" to a successful preference action. H.R.Rep. No. 595, 95th Cong., 1st Sess. 178 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News at 6139. Congress therefore

---

**40.** The 1984 and 1986 amendments to the Code affected section 547(b), but the amendments do not apply to these cases. *See supra* note 5.

dropped the requirement when it enacted the Code.

To make it easier for the trustee to recover preferential transfers and to further the twin goals of preference law, section 547 proceeds on the assumption that a debtor is "nearly always" insolvent during the three months before bankruptcy. *Id., reprinted in* 1978 U.S.Code Cong. & Admin.News at 6138. Thus, the statute creates a presumption (rebuttable only by certain statutory "exceptions") that transfers made on or within ninety days before the debtor files for bankruptcy are preferential. It generally leaves untouched transfers outside the ninety-day period.[41]

One might seriously question whether section 547 should even apply to payments made to undertakers in a Ponzi scheme such as this. For a Ponzi scheme that lasts more than three months, the statute's basic assumption does not go far enough. By definition, an enterprise engaged in a Ponzi scheme is insolvent from day one. Thus, *all* transfers to investors in a Ponzi scheme are preferential, not just those made within the three months before bankruptcy. Every transfer prefers the transferee to those investors at the end of the line.

The evil of a preferential transfer is that it "unfairly permit[s] a particular creditor to be treated more favorably than other creditors of the same class." Recent Developments, 3 Bankr.Dev.J. 365, 366 (1986). All investors in a Ponzi scheme are creditors of the same class, so in theory all should be treated equally. In effect, though, applying section 547 to a Ponzi scheme such as this favors some creditors over others. Under section 547 the creditors who are most preferred are allowed to keep their preferential payments because the transfers were made outside the statutory period,[42] while those the statute was meant to protect are hurt the most. Generally those investors paid within ninety days of bankruptcy will not have been paid in full. Were it not for the accident that they

had the misfortune to invest in the scheme late, they would have just as good a claim to the money they received as those who joined early and were fully repaid. Yet later investors—those hurt most by the debtor's demise—are required to return their payments, while earlier investors are not. The statute simply does not reach the early investors. Thus, applying the statute as written, the court is "compelled to take part in a farce whose result is ... to take away from those who have little, the little that they have." Letter from Justice Samuel F. Miller to William P. Ballinger (Jan. 13, 1878), *quoted in* C. Fairman, *Reconstruction and Reunion, 1864–88, Part I* 1069 (The Oliver Wendell Holmes Devise History of the Supreme Court of the United States vol. 6, 1971).

The equitable solution would be either to apply the statute to all transfers to investors in a Ponzi scheme—without regard to when the transfers were made—or to apply the statute to none of the transfers. Yet this court is no more free to rewrite the statute to bring the early undertakers into its net than it is to ignore the statute to treat later undertakers equally. Courts must apply the statute as written. The only question in these appeals is whether the bankruptcy court correctly applied the statute.

The bankruptcy court granted the trustee summary judgment on his first claim. The defendants appeal that ruling on three grounds. The defendants first argue that the property transferred was not property of the debtor and therefore not subject to avoidance under section 547. Second, the defendants contend that the trustee failed to prove all of the elements of a preferential transfer under section 547 and therefore the transfers may not be avoided. Finally, the defendants claim that all payments made within the preferential period fall within the "ordinary course of business" exception of section 547(c)(2) and thus may not be avoided. We have ad-

---

**41.** Section 547 does provide an exception to the ninety-day rule in the case of transfers to insiders who had reasonable cause to believe the debtor was insolvent at the time of the transfer. 11 U.S.C. § 547(b)(4)(B). The trustee does not argue that any of the defendants in these proceedings were "insiders."

**42.** Of course, the trustee may be able to recover the payments under other provisions of the Code, such as section 548. We are here concerned only with the equitable application of section 547.

dressed the defendants' first argument and have concluded that the property transferred was property of the debtors. We will now address the defendants' second and third arguments.

Section 547(b) establishes five requirements for a preferential transfer. The parties agree that the transfers the trustee seeks to avoid under his first claim were to creditors, were made while the debtors were insolvent, and (with one exception discussed later) were made within ninety days of the debtors' filing for bankruptcy relief. The defendants contend, however, that the trustee failed to carry his burden of proving that the transfers were "for or on account of an antecedent debt," 11 U.S.C. § 547(b)(2), and that the transfers enabled the defendants to receive more than they would have if "the case were a case under chapter 7," 11 U.S.C. § 547(b)(5).

With regard to subparagraph (2) of section 547, the only issue the defendants have raised is whether payments of so-called earnings were for "antecedent" debts.[43] The court's conclusion in parts IV–B and –C of this opinion that the trustee can avoid transfers in excess of a defendant's undertaking as fraudulent conveyances makes that question academic. Obviously, the trustee cannot recover twice for the same transfer, so it is irrelevant whether he could also recover the transfers as unlawful preferences.

With regard to subparagraph (5), the defendants argue that the trustee has failed to meet his burden of showing that, because of an allegedly preferential transfer,

the transferee received more than he would have received under a chapter 7 liquidation.

The bankruptcy court first set forth the applicable standard for such a determination: The court must construct a hypothetical liquidation of the debtor's estate to determine whether the creditor received more as a result of the alleged preferential payment than he would have received at the time of the bankruptcy (as opposed to the time of the transfer) under a chapter 7 liquidation had the payment not been made. 41 B.R. at 1013 (citing *Palmer Clay Prods. Co. v. Brown*, 297 U.S. 227, 229, 56 S.Ct. 450, 451, 80 L.Ed. 655 (1936)). The trustee need only show that the defendant received some payment on his claim within ninety days and that a chapter 7 liquidation would result in a distribution to creditors of less than 100 percent of their claims. Under such circumstances, the payment to the defendant enables him to receive more than he would have received under a liquidation had the transfer not been made.[44] *See Palmer Clay*, 297 U.S. at 229, 56 S.Ct. at 450. *See also Henderson v. Allred (In re Western World Funding, Inc.)*, 54 B.R. 470, 479 (Bankr.D. Nev.1985) ("If the dividend would be less than 100%, the defendants would 'receive more' if allowed to retain the payments, and also share in a pro-rata distribution on any remaining claims"), and authorities cited therein.

Applying that standard to the facts before it, the bankruptcy court stated:

[I]t appears that approximately 924 investors, who invested sums aggregating

**43.** The parties apparently do not dispute the fact that the transfers were made for or on account of debts. *See* Brief of Appellee and Cross Appellant Robert D. Merrill, Trustee, at 19; Brief of Appellants and Cross Appellees Listed in Appendix A at 25; Response Brief of Defendant-Appellant and Cross-appellee Ruby K. Van Sant at 11. Neither do they dispute the fact that transfers that repaid a defendant's principal undertaking were made for or on account of an antecedent debt.

The trustee's apparent position on these points is inconsistent with the position he took on his third claim, in which he argued that the defendants were holders of an equity interest in the debtors and not creditors of the debtors. If all

transfers to the defendants were payments of an antecedent debt, as the trustee argues in support of his first claim, then the defendants would be creditors of the debtors and not owners.

**44.** An example from *Palmer Clay* will help show that this is so. Suppose a creditor with a claim for $10,000 receives a $1,000 payment on account within the preference period. Further suppose that the distribution to creditors under a liquidation would be 50%. The creditor to whom the payment on account is made receives $5500 (the $1,000 preferential payment plus 50% of $9,000, his remaining claim), while another creditor to whom the same amount was owing and no payment was made will receive only $5000. 297 U.S. at 229, 56 S.Ct. at 450.

more than 4 million dollars, received no returns and lost all of their original investment. Affidavit of Ron N. Bagley in Support of Trustee's Amended Motion for Summary Judgment at ¶ 30 (Feb. 24, 1984). It is true that the trustee has not constructed a hypothetical distribution to demonstrate what percentage of their debts the investors will likely recover in this case. From a practical standpoint, it is doubtful whether this is possible in the situation, as here, where all of the assets of the estate consist of contingent recoveries from the trustee's litigation. But it is perfectly clear on the evidence presented that there will not be a 100 percent dividend to creditors. In a summary judgment proceeding, the court is not precluded from taking judicial notice of the record in the case. When we consider that 924 investors have claims exceeding four million dollars, for which they received nothing, scheduled claims for principal and unpaid interest total more than 50 million dollars, most of the administrative expenses allowed by this Court, which exceed $600,000.00, have not been paid, the liquid assets of the debtors' estate have never exceeded $150,000.00, and the United States claims substantially all of the assets sought to be recovered by the trustee under the criminal forfeiture provisions of the R.I. C.O. statute, it is perfectly clear that the [allegedly preferential] payments enabled defendants to receive more than they would under Chapter 7. Accordingly, I find that the requirements of Section 547(b)(5) have been met.

41 B.R. at 1013 (footnote omitted). We agree.

■■■ Finally, the defendants argue that, even if the requirements of section 547(b) have been met, the transfers to them cannot be avoided because they come within the "ordinary course of business" excep-

tion for preferential transfers, found in section 547(c). That section states:

The trustee may not avoid under this section a transfer—

. . . . .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made not later than 45 days after such debt was incurred;

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(D) made according to ordinary business terms

. . . .

11 U.S.C. § 547(c)(2) (1982).[45]

The bankruptcy court concluded that the defendants had not borne their burden of proving each of the four elements of section 547(c)(2).[46] Of course, that conclusion alone would not justify the court in granting the trustee's motion for summary judgment. To oppose successfully a motion for summary judgment, a party need not prove its case. It is enough if it shows that, given the undisputed facts in the record, the moving party is not entitled to a judgment as a matter of law. See Fed.R.Civ.P. 56(c).

The trustee introduced no evidence that the transfers he sought to avoid were made other than in the ordinary course of the debtors' financial affairs and according to the contract terms. Rather, he moved for

---

**45.** The 1984 amendments to the Code deleted subparagraph (B) and redesignated subparagraphs (C) and (D) accordingly. The amendments, however, do not apply to these cases. See supra note 5.

**46.** The 1984 amendments added subsection (g) to section 547, which makes clear that the party "against whom recovery or avoidance is sought has the burden of proving the nonavoidability

of a transfer under subsection (c) of this section." Although the 1984 amendments do not apply to these adversary proceedings, subsection (g) merely codified prior case law. See, e.g., Richter & Phillips Jewelers & Distribs., Inc. v. Dolly Toy Co. (In re Richter & Phillips Jewelers & Distribs., Inc.), 31 B.R. 512, 514–16 (Bankr.S. D.Ohio 1983).

summary judgment on the grounds that the ordinary course of business exception "was not intended to cover the type of transactions at issue in this proceeding." Memorandum of Points and Authorities in Support of Trustee's Motion for Summary Judgment at 39, Record on Appeal, No. C–84–0927W, at 87. He argued that there can be no ordinary course of business exception for payments in furtherance of a Ponzi scheme. *Id.*

Apparently, the bankruptcy court agreed. The bankruptcy court concluded that transfers to defendants within the ninety-day preference period were not made "in the ordinary course of business of the debtors and the defendants and made according to ordinary business terms." 41 B.R. at 1014.[47] Rather, all the transactions "were unusual, extraordinary, and unrelated to any business enterprise whose protection was intended by the drafters of Section 547(c)(2)." *Id.* at 1015.[48]

We believe that the bankruptcy court read section 547(c)(2) too narrowly. Just because a debtor does not have a legitimate or "ordinary" business does not mean that transfers he makes in the course of that business may not be made in the "ordinary course of business."

As the bankruptcy court noted, the Code does not define "ordinary course of business." In construing the statute, we must be guided by its purpose. *See Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979). As we have noted, the purpose of section 547 is to discourage the race to the courthouse and to promote the equal treatment of creditors. Not all transfers by a debtor on the eve of bankruptcy, however, threaten to set off a race to the courthouse or to undermine the equal treatment of creditors. Transfers in the ordinary course of the debtor's business are presumably of this kind. By section 547(c)

Congress meant "to leave undisturbed normal financial relations [of the debtor], because [they do] not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." H.R.Rep. No. 595, 95th Cong., 1st Sess. 373 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6329.

We believe that, viewed in light of the statute's purpose, the transfers to defendants in this case may have been made in the "ordinary course" of the debtors' business. The debtors' business was to solicit "undertakings" from investors and to pay the undertakers according to the terms of their contracts, in order to attract new undertakers. There is nothing in the record to indicate that the payments in question were any different from any other payments on the clearinghouse contracts, that they were made according to other terms or that the underlying debts were incurred in other than the ordinary course of the debtors' admittedly fraudulent business. There is nothing to indicate that the transfers were not in conformity with the prior dealings of the parties, with the prior practice of the debtors or with the practices of others engaged in the same type of fraudulent business. Moreover, the payments did not threaten to set off a race to the courthouse. In fact, they had just the opposite effect. The race to the courthouse would have started sooner if the debtors had *not* made the payments in question.

Of course, preventing the race to the courthouse is just one purpose of the preference statute. It is also meant to minimize the unequal treatment of creditors. The bankruptcy court concluded that, in passing section 547(c)(2), "Congress did not intend to protect one group of investors in a 'Ponzi' scheme over the rest." *Id.* at 1014. Yet by refusing to recognize an ordinary course of business exception in this case, that is exactly what the bank-

---

**47.** The bankruptcy court's decision on this point has since been followed by other courts. *See, e.g., Graulty v. Brooks (In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.)*, 819 F.2d 214 (9th Cir.1987); *Henderson v. Allred (In re Western World Funding, Inc.)*, 54 B.R. 470, 481 (Bankr.D.Nev.1985).

**48.** It is not clear what "business enterprise" the bankruptcy court was referring to. If the court meant that the debtors were not business enterprises "whose protection was intended by the drafters" of the Code, the court was of course free to dismiss the bankruptcy case under 11 U.S.C. § 1112(b). *See supra* part II.

ruptcy court did. It treated more favorably those defendants who received payments outside of the ninety-day preference period, at the expense of those defendants who entered the scheme late and lost all or most of their undertaking, without any showing that the later investors had any worse claim to the money than the earlier investors. Rather than protecting those defendants who received transfers on the eve of bankruptcy, the bankruptcy court's interpretation of section 547(c)(2) hurt them. Congress may not have intended to protect one group of investors over the rest, but neither did it intend to make one group bear a disproportionate share of the loss.

Thus, avoiding the allegedly preferential transfers in this case would do little to further the twin goals of preference law. Moreover, avoiding the transfers would do little to deter similar transfers in the future, since in theory such transactions "would have taken place regardless of the debtor's financial straits." Nutovic, *The Bankruptcy Preference Laws: Interpreting Code Sections 547(c)(2), 550(a)(1), and 546(a)(1),* 41 Bus.Law. 175, 181 (1985). This is especially true of transfers in furtherance of a Ponzi scheme.

This does not mean that the defendants all have a good defense to the trustee's first claim. We do not hold that the ordinary course of business exception applies to every transfer the trustee seeks to avoid by that claim. If a defendant knew of a debtor's financial woes and sought and obtained accelerated payments under the contract, for example, the transfer may not have been made in the "ordinary course" of even the debtors' extraordinary business.

Whether any of the transfers at issue here fit that classical preference situation is a matter for the bankruptcy court to determine on remand. We simply hold that the bankruptcy court erred in granting the trustee summary judgment on his first claim. On the state of the record before the bankruptcy court, the trustee was not entitled to a judgment as a matter of law. A transfer does not fall outside the scope of section 547(c)(2) simply because it was made in furtherance of a Ponzi scheme.

On remand the defendants will still have the burden of showing that the transfers in question meet all four requirements of section 547(c)(2), including the requirement that the transfer be made not later than forty-five days after the debt was incurred.[49] But by leaving open the possibility of an exception to the trustee's preference actions, all creditors are put on a more equal footing.

### E. Prejudgment Interest

■■■ The defendants contend that the bankruptcy court abused its discretion in granting prejudgment interest to the trustee. To the extent we have reversed the bankruptcy court's grant of summary judgment to the trustee, we vacate any award of prejudgment interest. However, to the extent we affirm the bankruptcy court on the merits of the trustee's claims, the propriety of awarding prejudgment interest on those claims is still at issue.

The defendants acknowledge that the court has broad discretion in determining when prejudgment interest should be

---

**49.** As part of the 1984 amendments, Congress did away with the forty-five day requirement. *See supra* note 45. However, these cases must be judged under the statute as it existed before the amendments. *See supra* note 5.

In his motion for summary judgment the trustee argued that the transfers did not qualify for the ordinary course of business exception because they were not made within forty-five days after the debts were incurred. The trustee argued that a debt was incurred when a debtor received a defendant's undertaking. Assuming that the trustee was correct, he was still not entitled to summary judgment on the state of

the record because he failed to show how soon each transfer was made after the debtor received a defendant's undertaking. The contract allowed a defendant to choose monthly payments, so it is possible that at least some of the allegedly preferential payments were made within forty-five days after the debtor received the defendant's money. If the forty-five day requirement remains an issue on remand, the bankruptcy court may have to determine for each allegedly preferential transfer whether it was made "not later than 45 days after [the] debt was incurred."

granted to the prevailing party, but they argue that the court's failure to consider the merit of their defenses constitutes error because such consideration was essential to the proper exercise of the court's discretion. The defendants, however, cite no authority for their argument.

The same argument was made in a related case, *Merrill v. Allen (In re Universal Clearing House Co.)*, 60 B.R. 985, 1001–02 (D.Utah 1986). For the reasons stated in that decision, we reject the argument. The bankruptcy court did not abuse its discretion in awarding prejudgment interest from the date of commencement of the adversary proceeding. Thus, to the extent that the court affirms the bankruptcy court on the merits of the trustee's claims, the bankruptcy court's award of prejudgment interest in these adversary proceedings is also affirmed.

## V.

## DEFENSES UNIQUE TO PARTICULAR DEFENDANTS

### A. *Defendant Ruby Van Sant*

Ruby Van Sant appeals from the bankruptcy court's grant of summary judgment against her on the trustee's first and second claims. As to the trustee's second claim, she contends that the record does not support the summary judgment against her and that the bankruptcy court erred in failing to address the issue of recoupment. We find for defendant Van Sant on both issues. We cannot, however, agree with her contention, under the trustee's first claim, that payments she received within

**50.** Although this language does not quote the complaint, it was apparently meant to reflect the language of the trustee's second and third claims respectively as set forth in the complaint, which purported to seek recovery against defendant Van Sant under all three claims. Supplemental Record on Appeal in No. C–84–1225W at 2A, 3, 16A.

**51.** The trustee's explanation is that Van Sant entered into multiple investment contracts with the debtors and that although she suffered a net loss on some of those contracts, she received

the ninety days before the filing of the debtor's petition in bankruptcy did not come within section 547(b) of the Code.

### 1. *Appropriateness of Summary Judgment*

Defendant Van Sant contends that the record does not support summary judgment on the trustee's second claim and that the bankruptcy court erred in determining that there were no material factual issues. She argues that the Bagley affidavit, the only affidavit filed in support of the motion, presented facially inconsistent facts and that the affidavit itself thereby raised a material factual issue.

By his second claim the trustee sought to recover all transfers to a defendant that exceeded the defendant's undertaking. The bankruptcy court granted summary judgment in favor of the trustee on his second claim but did not allow him to recover payments that did not exceed a defendant's undertaking. Thus, a crucial factual issue in the bankruptcy court was whether Van Sant had suffered a net loss or received a net gain.

Taken together, the Bagley affidavit and its exhibits asserted that Van Sant (a) "withdrew from the ... program and thereby received from the debtors the full amount of [her] deposit, together with additional sums representing ostensible 'profits' or 'earnings,' " and (b) "received payments representing ostensible 'profits' or 'earnings' from the debtors but realized net losses on [her] investments." [50] Bagley affidavit at 9, ex. D at 7, ex. E at 80. In his brief, the trustee offers an explanation for the affidavit's facial inconsistency.[51] The record, however, contains no such explana-

fictitious "profits" in addition to the principal amounts she invested under other contracts. The trustee does not, however, offer any arguments for considering Van Sant's investment contracts separately. The number of documents does not necessarily indicate the number of contracts. Just as one document may give rise to a series of contracts, one contract may be embodied in several documents. It is not at all clear to us that Van Sant's total investment with the debtors should not be considered one transaction embodied in several documents.

tion. The bankruptcy court's opinion gives no indication that any such explanation was presented for its consideration. It appears rather that the bankruptcy court was unaware of the affidavit's inconsistency. The trustee may not now supplement the record on appeal by means of the arguments presented in his brief. It is well settled that issues not presented to the trial court "need not be considered on appeal." *Kenai Oil & Gas, Inc. v. Department of the Interior,* 671 F.2d 383, 388 (10th Cir.1982). This general rule applies with equal force in bankruptcy appeals. *See, e.g., Beery v. Turner (In re Beery),* 680 F.2d 705 (10th Cir.), *cert. denied,* 459 U.S. 1037, 103 S.Ct. 449, 74 L.Ed.2d 604 (1982).

██ A material factual issue was presented not only by the apparent factual inconsistency of the only affidavit submitted in support of the trustee's motion, but also by both the answer to the complaint and the answers to interrogatories. Defendant Van Sant consistently stated in both of those documents that she had not received payments from the debtors in excess of her investment but rather suffered a net loss. Record on Appeal in No. C–84–1225W at 46, 15–16.

Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to the bankruptcy court by Bankruptcy Rule 7056, governs the granting of summary judgment. It requires the court to render judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Under this standard, the record did not support the judgment.[52] We therefore reverse the bankruptcy court's grant of summary judgment against defendant Van Sant on the trustee's second claim.

## 2. Recoupment

██ Defendant Van Sant's second argument is that the bankruptcy court erred in failing to consider her recoupment defense to the trustee's second claim.[53] She contends that the sixth defense in her *pro se* answer to the complaint set forth the defense of recoupment despite her failure to employ that term of art. The sixth defense reads as follows:

> This Defendant has incurred substantial losses as a result of her investment with Universal Clearing House Company. Any relief sought by the Trustee for the alleged benefit of the creditors should be limited to recovery against the principals and agents of the debtors who profited from the investments by this Defendant and the other creditors. *It would be unfair, inequitable, and beyond the scope and intent of the bankruptcy law to impose further losses upon this Defendant by requiring her to pay back the amounts she received in partial repayment of the amounts she deposited with the debtors.*

Record on Appeal in No. C–84–1225W at 46 (emphasis added). Although defendant Van Sant's answer did not set forth the factual basis for her recoupment defense, her answers to the interrogatories did. Answer number 7 reads as follows: "All payments received by me were used to purchase new contracts except for the months of May, June and July." *Id.* at 15.

*Recoupment* is defined as "the setting up of a demand [or defense] arising from

---

**52.** Apparently, Van Sant did not oppose the trustee's motion for summary judgment. However, because the trustee failed to make out a prima facie case for summary judgment, Van Sant's opposition to the motion was not required. *See United States v. Crooksville Coal Co.,* 560 F.Supp. 141, 142 (S.D. Ohio 1982) (the fact that a motion for summary judgment is unopposed "does not relieve the Court of the task of determining whether a material factual dispute exists"); Fed.R.Civ.P. 56(e) advisory committee's note to the 1963 amendment ("Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented").

**53.** Should the trustee not prevail on his third claim on remand and should Van Sant establish that she suffered a net loss on her investment, the recoupment issue would be moot. *See also infra* note 54 and accompanying text.

the *same transaction* as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim." 4 *Collier on Bankruptcy* ¶ 553.03 at 553–13 (L. King 15th ed. 1987). A typical scenario giving rise to the recoupment defense is a suit for payment under a construction contract that the defendant claims was not fully performed. If the defendant can prove his claim, he is entitled to a reduction in the amount of damages awarded the plaintiff. *See Ashland Petroleum Co. v. Appel (In re B & L Oil Co.),* 782 F.2d 155, 157 (10th Cir.1986). The underlying policy is that "the defendant should be entitled to show that because of matters arising out of the transaction sued on, he is not liable in full for the plaintiff's claim." 4 *Collier on Bankruptcy, supra,* ¶ 553.03 at 553–14.

Although this case may not be the typical recoupment case, the same underlying policy applies. If Van Sant can prove that her total investment with the debtors was one transaction and that she did not retain payments made to her by the debtors but rather reinvested those funds with the debtors, she is entitled to either a reduction in or an abatement of the damages. In other words, Van Sant should not have to return more than she actually received from the debtors. For example, if she ostensibly received $100,000 but $50,000 of that amount went to purchase other investment contracts from which she received nothing, she should only be liable for at most the $50,000 she received and not the whole $100,000.

The documents Van Sant submitted with her answers to interrogatories indicate that she may be able to prove the elements of the recoupment defense. Several of the contracts do not bear her signature but were apparently prepared and signed on her behalf by an agent of the debtors. Record on Appeal in No. C–84–1225W at 19, 23, 25, 27, 29, 31, 35, 38 & 40. This implies that payments the debtors purportedly made to Van Sant may never have reached her but rather may have been applied by the sales agent directly to the purchase of new investment contracts on her behalf.

The trustee maintains that Van Sant's sixth defense did not specifically raise the recoupment defense. He argues that it was nothing more than an empty lamentation of the unfairness of the debtors' scheme. We cannot agree. Rule 8(f) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Bankruptcy Rule 7008(a), provides that "[a]ll pleadings shall be so construed as to do substantial justice." This court has long been bound by the rule that justice requires especially liberal construction of the pleadings of *pro se* litigants. *Conley v. Gibson,* 355 U.S. 41, 47–48, 78 S.Ct. 99, 102–03, 2 L.Ed.2d 80 (1957). Under these rules of construction, we must find that Van Sant raised the recoupment defense despite the inartfulness of her pleading.

The trustee further argues that the doctrine of recoupment does not apply to defendant Van Sant's case because her claim does not arise from the same transaction as does the trustee's claim. Although the trustee cites cases in which the recoupment defense did not prevail because a series of transactions were involved and also maintains in another section of his brief that Van Sant's investment with the debtors consisted of several separate and distinct investment contracts, *see supra* note 51, this is not the basis of his argument. Rather, he argues that

[t]he trustee's action arose from the fraudulent Ponzi scheme while the defendant bases her claim on the fictitious investment contracts. The subject matter of [both claims] may be similar yet one transaction involves purported investments in an accounts payable program while the other involved defrauding investors through an elaborate corporate facade and Ponzi scheme. The program in which the defendant believed she was investing was very ... different from the ... operation in which she actually invested. The transaction conducted under the guise of the debtor's investment program was not the same transaction whereby the defendant received "profits" from the debtors under the Ponzi scheme.

Reply Brief of Appellee and Cross-Appellant, Robert D. Merrill, Trustee, at 17–18. We find this argument to be without merit.

The trustee urges us to adopt a rule of law that would deny all victims of fraudulent transactions the right of recoupment. Even if equity did not counsel against so incongruous a result, we cannot deny victims of fraud the rights enjoyed by parties to legitimate transactions simply because we know of no legal theory supporting such a result.

The trustee further maintains that the policy of equality of distribution embodied in the bankruptcy code precludes the assertion of the recoupment defense in a case involving a Ponzi scheme. The trustee bases his argument on the assumption that Van Sant's recoupment claim is based on nothing more than having suffered a net loss on her investment. Such an assumption is incorrect in this case. Defendant Van Sant's recoupment defense arises from the reinvestment of funds she received from the debtors. Under such circumstances, the equitable principles of the bankruptcy code do not preclude but rather support Van Sant's assertion of the recoupment defense. She must be allowed the opportunity to prove, if she can, that payments purportedly made to her by the debtors actually remained part of or were reintroduced into the debtors' estate. They were simply "rolled over." The debtors have them. She does not.

The factual basis for Van Sant's recoupment defense also makes the trustee's argument concerning preferential payments unnecessary. Van Sant's answer to interrogatory number 7 indicates that she ceased reinvestment prior to the preference period. She stated, "All payments received by me were used to purchase new contracts except for the months of May, June and July." Record on Appeal in No. C–84–1225W at 15. As indicated above, the date of filing in this case was September 16, 1981. 41 B.R. at 991. Therefore, the ninety-day preference period began on approximately June 18, 1981. There is no indication in the record that Van Sant reinvested any payments that she may have received during the preference period. In fact, she indicates in her brief that she received no payments after July 1981. Opening Brief

of Appellant at 16. The recoupment defense is therefore inapplicable to any payments she may have received during the preference period.[54]

In light of the Tenth Circuit Court of Appeal's recent decision that the recoupment doctrine applied to a contract for the sale of petroleum, *Ashland Petroleum Co. v. Appel (In re B & L Oil Co.)*, 782 F.2d 155 (10th Cir.1986), we believe that the bankruptcy court is required to consider Van Sant's recoupment defense.

*3. Section 547(b)*

Finally, Van Sant claims that payments she received from the debtors within the ninety days before Universal Clearing House (UCH) filed its petition in bankruptcy were not preferential transfers avoidable under section 547(b) of the Code. We have already considered the defendants' common arguments for why transfers within the ninety-day preference period should not be avoided. The only argument we need address here is Van Sant's argument that the payments to her were made outside the preference period because an order for relief was not granted against Payable Accounting Company (PAC) until August 16, 1982.

This argument is based on the premise that Van Sant dealt with PAC, not UCH. Our review of the record leads us to conclude that this claim borders on the frivolous. Van Sant entered into at least fourteen contracts that very clearly establish her contractual relationship with both PAC and UCH. *See* Record on Appeal in No. C–84–1225W at 17–43. Van Sant's answers to the complaint and to interrogatories also indicate that she dealt with UCH. *Id.* at 14–15, 44–46. *See also* Van Sant's sixth defense as set forth above. On the record before us, we must conclude that Van Sant dealt with UCH and that payments she received within the ninety days before UCH filed its petition were made within the preference period. However, for the reasons stated in part IV–D of this opinion, we reverse the summary judgment entered

**54.** Should Van Sant prevail in her recoupment defense, she would be entitled to a reduction in or an abatement of the pre-preference period

damages because those are the funds that she claims to have reinvested with the debtors.

against Van Sant on the trustee's first cause of action.

## B. Defendant Thomas Richards

Thomas Richards appeals from the bankruptcy court's grant of summary judgment against him and in favor of the trustee. Defendant Richards's sole contention is that the amount of damages awarded was erroneous. Richards argues that the judgment against him should order recovery not of $8,633.60 but of no more than $1,533.60.[55] The record on appeal supports his argument.

Considering that approximately two thousand adversary proceedings were filed in this case, 41 B.R. at 990–91, and that most if not all of them were disposed of summarily, it is unfortunately all too probable that error concerning the amount of damages might occur in one of those proceedings. Our review of the record, as outlined below, indicates that just such an error did occur in Richards's case.

The judgment against Richards, for $8,633.60, was entered on March 22, 1985, pursuant to the Order Respecting Summary Judgment. *See* Record on Appeal in No. C–85–0437W at 241–42, 236–40. The order granted the trustee's motion for summary judgment on his second claim.[56] *Id.* at 238. The trustee's second claim was to recover as fraudulent conveyances cash payments made to the defendants by the debtors in amounts exceeding the defendants' undertakings. Exhibit A to the amended complaint lists the defendants to whom the second claim applies and the amount of the claim against each defendant, under the heading "Claim II." *See id.* at 47, 56–66. According to exhibit A, the trustee sought to recover $8,634.00 from defendant Richards on his second claim. *Id.* at 63A.

Richards stated in his answer to the complaint that "$8,634.00 . . . is not the amount received by Thomas D. Richards in excess of deposits made to Independent Clearing House." *Id.* at 156. In his answers to the

trustee's first set of interrogatories, Richards spelled out his dealings with the clearinghouse:

9. The amount received from ICH was as follows:

amount invested by defendant $7100. dividends or returnes [sic] from this amount were

| | |
|---|---|
| January 9th | $ 340.80 |
| February 6th | 596.40 |
| March 10th | 596.40 |
| Total received | $1533.60 |

*Id.* at 32. All six documents submitted with his answers support Richards's accounting. The contract, the statement of the contract account and the document entitled "Commitment to Assume Debt" show that the amount invested was $7,100.00. *Id.* at 33A–35. The statements accompanying the payments that ICH made to Richards, dated January 9, 1981, February 6, 1981, and March 10, 1981, indicate that Richards received payments of "earnings" of $340.80, $596.40 and $596.40 respectively and that his "undertaking" was $7,100.00. *Id.* at 36–38. That undertaking was repaid on March 10, 1981. The repayment conforms with the terms of the contract, which specified that the investment was for a period of not less than two nor more than nine months, *id.* at 35, and with the notice at the bottom of each statement that the "contract expires February 29, 1981 [sic]," *id.* at 36–38.

From the bankruptcy court's decision, it is clear that the trustee sought and the court intended to grant recovery on the trustee's second claim only for an amount equal to what a defendant received in excess of his undertaking. Richards's answer to the complaint, answers to interrogatories and accompanying documents not only disputed the amount of damages the trustee sought but in fact demonstrated that the correct amount was $1,533.60 rather than $8,633.60. For that reason, the amount of the judgment entered against defendant Richards should be reduced to $1,533.60.

---

**55.** Richards, appearing *pro se,* stated his appeal at oral argument. Neither he nor the trustee filed a brief in this matter.

**56.** The order also granted the trustee summary judgment on his first claim, but Richards was not named in that claim.

## VI.

## MOTIONS TO VACATE DEFAULT JUDGMENTS

We next address the appeals from the bankruptcy court's order denying motions to vacate default judgments. These particular appeals raise the issue of whether the bankruptcy court abused its discretion by denying certain defendants' motions to vacate default judgments earlier entered against them. This issue is complicated by the unique circumstances underlying the entry of the default judgments.

### A. Background

As has been made evident above, the collapse of the clearinghouses, the filing of the bankruptcy petitions, the bringing of some two thousand adversary proceedings against investors, many of whom had already lost substantial sums, and the substantial confusion that followed—all overshadowed by a major criminal investigation against the clearinghouse principals—distinguish this case from the ordinary bankruptcy proceeding. Many of the undertakers were unsophisticated in investment matters and had invested a substantial portion of their savings on the strength of advice from friends. When the scheme was uncovered and the clearinghouses collapsed, the investors understandably felt betrayed, confused and anxious about their money. The initial appointment and subsequent reorganizations of a creditors' committee did nothing to clear up the confusion. The sheer number of adversary proceedings and the unorganized way in which many were handled made it virtually impossible for the investors to know who was doing what to whom.[57]

During this time of uncertainty and strong feelings, the defendants, many of whom had lost most of their initial investments, learned that they stood to lose the little they had received. Yet, judging from the large number who appeared pro se, they either could not afford an attorney or did not recognize the need for one.

Against this backdrop, shortly after the filing of the adversary proceedings some of those investors against whom adversary proceedings had been filed composed a letter and mailed it to "all creditors of Universal Clearing House and Independent Clearing House." Pertinent portions of the letter are as follows:

Most of you by this time have undoubtedly been served a summons and complaint in an "Adversary Proceeding" by the Trustee, Robert Merrill and his Attorney, William Fowler. We have been informed that when Mr. Goss an attorney in Mr. Fowler's office was asked if he thought that the undertakers had the money to make the payment if judgment were entered for the Trustee and against the undertakers, he reported "They all have cars, houses and other assets". Make no mistake, the Trustee and his counsel WILL COLLECT IF THEY GET JUDGEMENT, and they will do so unless we act together. We therefore hope you will read the rest of this letter and get in touch with us.

We as creditors of the above companies are very concerned with the developments in the bankruptcy proceedings of the above companies, and feel it is imperative that all creditors be informed of the same.

We have researched the affairs of the companies and reviewed the bankruptcy proceedings. As a result we have concluded that the creditor's interests have not been the concern of the Trustee, his attorneys and the former Trustee now acting as accountant. [A synopsis of their findings and conclusions followed.]
. . . .

---

57. The confusion is evident from the proceedings in this court, where numerous appeals have been dismissed as duplicates and numerous other appeals that should have been consolidated have slipped through the cracks. Even now— over six years after the initial filings in bankruptcy and over four years after the adversary proceedings were filed—it is a monumental task just to identify all of the defendants and the plaintiff's claims against them.

WE HAVE BEEN INFORMED THAT IF CREDITORS DO NOT ANSWER THE COMPLAINT, A DEFAULT JUDGMENT WILL BE TAKEN AGAINST THEM. If an answer is filed, we are advised that the Trustee will probably send interrogatories (requests for answers to legal questions regarding your account), which when answered, will result in the Trustee's counsel filing motions for summary judgments against the creditors. It has been suggested that all creditor-defendants file a general denial to the complaint and then join a counter-claim to be filed by us against the Trustee, Mr. Fowler, Mr. Bagley and a number of John Doe Defendants. This counter-claim against the Trustee and his counsel and the John Doe defendants, will be based on breech [sic] of fiduciary duty to the creditors, his failure to file a plan of reorganization as required by the Bankruptcy Act, and his persistent, deliberate and flagrant abuse of the rules and processes of the Bankruptcy Court to obstruct consideration of reasonable programs of rehabilitation, and filing of groundless and worthless lawsuits to harass and vex people who have already been damaged, for the sole purpose of generating huge fees for himself. The signers of this letter are proceeding in this manner. Several of the largest creditor-defendants have retained attorneys to represent them. Others are acting pro se, that is, for themselves. We are attaching a form being filed by one of the pro se defendants. He had advised us that all creditors who intend to defend themselves are welcome to use this pleading adjusted to their personal situation.

> Yours for victory
> /s/ Neil Chadwick
> /s/ Ralph Ferrin
> /s/ Clarence A. Jorgensen
> /s/ Richard B. Bird
> /s/ J. Wayne Fogg

P.S. Again, we are merely advising you of the actions taken by other creditor-defendants. You may or may not choose to proceed in this manner. We are saying that something must be done to preclude a default judgment and of this you should be aware. The final choice of procedure is yours.

Attached to the letter was a form answer and counterclaim, the essence of which many defendants, acting *pro se,* filed with the bankruptcy court.

The trustee responded by moving to dismiss the counterclaim, by moving to strike the counterclaim and answer as sham and false and for lack of good faith, and by moving for the imposition of sanctions against those who had filed the form pleadings. In support of these motions, the trustee pointed to the "prohibition against laymen practicing law" in our society and asserted that, because the "defendants entrusted the preparation of their legal defenses to individuals who are not lawyers," the answers and counterclaims constituted "sham pleadings and an abuse of the federal judicial system." The trustee further asserted that "[b]y their rash and frivolous course of action, defendants have knowingly and intentionally compounded and multiplied these proceedings and have caused considerable and unnecessary expense to the trustee, his accountant and attorneys, for which the imposition of sanctions is appropriate and necessary." Memorandum of Points and Authorities in Support of Motion to Dismiss Counterclaim at 7.

The trustee noticed a hearing on the motions to strike the form answers and counterclaims, but the defendants did not attend. Accordingly, by order dated December 29, 1983, the bankruptcy court granted the trustee's motion and ordered the pleadings stricken. The court further ordered that each defendant be required to pay a $100 sanction to the trustee and that, until such sum was paid, any pleading filed in response to the complaint would be deemed a nullity.

After the ruling of the bankruptcy court, the defendants did nothing. Accordingly, upon motion of the trustee, the bankruptcy court entered default judgments against the defendants in March 1984.[58]

---

58. Those defendants who suffered default judgments in the bankruptcy court are so identified in appendix A.

On August 6, 1984, the bankruptcy court issued its decision on the trustee's motion for summary judgment in those cases in which default judgments had not been entered, granting judgment in favor of the trustee on his first two claims and dismissing the trustee's third claim for relief. Following this August 6 opinion, the appellants retained counsel and filed motions to set aside the default judgments. These motions were all filed in August or September of 1984.

In support of their motion to set aside the default judgments, the defendants contended that the trustee's response to the filing of the form pleadings was wholly unjustified. They pointed to the unique circumstances present and stressed that many of the investors were unsophisticated, were not represented by counsel and were merely trying to protect themselves from what they perceived to be unjust claims. They urged that the stricken pleadings coupled with their dismay, disbelief and discouragement with the bankruptcy court explained why they did not file any further pleadings in these matters.

After reviewing the facts underlying the entry of the default judgments and the law regarding the setting aside of such judgments, counsel for defendants asked the court to consider the defendants' failure to respond to the complaints a second time "a product of confusion or ignorance on behalf of the defendants." Counsel also pointed to the August 6 opinion, which rejected the trustee's third claim for relief, presumably in an attempt to demonstrate the existence of a meritorious defense to at least one of the trustee's claims.

In January 1985, the bankruptcy judge denied the defendants' motion to vacate the default judgments, finding that "no grounds have been shown warranting the vacating of said judgment[s], nor has any meritorious defense been shown." It is this order that is currently on appeal before this court.

Appellants contend that the bankruptcy court abused its discretion by refusing to vacate the default judgments and advance several rationales to support their conten-

tion. They begin with the proposition that, because default judgments are generally disfavored, any doubt should be resolved in favor of granting a motion to set aside a default judgment so long as the motion is timely and the movant has a meritorious defense. They point out that the rules governing the setting aside of judgments are to be liberally construed and argue that proper application of those rules to these appeals requires reversal of the bankruptcy court's decision.

The trustee disagrees. He reasons that because motions to set aside default judgments lie within the sound discretion of the trial court, the trial court's ruling should not be disturbed absent a showing by appellants that such discretion was clearly abused. The trustee stresses that the movants have the burden of demonstrating a justification for relief from the judgment or order involved. He argues that appellants failed to allege any justifiable grounds for vacating the default judgments and that the bankruptcy court therefore did not abuse its discretion in denying their motion.

### B. Standard of Review

■ The setting aside of judgments or orders, including default judgments, is governed by rule 60(b) of the Federal Rules of Civil Procedure, made applicable to bankruptcy proceedings by Bankruptcy Rule 9024. Motions for relief under rule 60(b) lie within the discretion of the trial court. *Otoe County Nat'l Bank v. W & P Trucking, Inc.*, 754 F.2d 881, 883 (10th Cir.1985). *See also Falk v. Allen*, 739 F.2d 461, 462 (9th Cir.1984); *Cessna Fin. Corp. v. Bielenberg Masonry*, 715 F.2d 1442, 1445 (10th Cir.1983). However, such discretion may not be exercised capriciously. *Ledwith v. Storkan*, 2 F.R.D. 539 (D.Neb.1942). In the case of motions to vacate default judgments, a trial court's discretion is limited by three important considerations:

First, Rule 60(b) is remedial in nature and therefore must be liberally applied. Second, default judgments are generally disfavored; whenever it is reasonably possible, cases should be decided on their merits. Third, and as a consequence of

the first two considerations, "[w]here timely relief is sought from a default judgment and the movant has a meritorious defense, doubt, if any, should be resolved in favor of the motion to set aside the judgment so that cases may be decided on their merits."

*Schwab v. Bullock's, Inc.*, 508 F.2d 353, 355 (9th Cir.1974) (citations omitted). *See also Falk*, 739 F.2d at 463. These factors must be kept in mind when considering whether the bankruptcy court abused its discretion in denying defendants' motions.

### C. Analysis

■ Rule 60(b) provides in pertinent part:

On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; ... or (6) any other reason justifying relief from the operation of the judgment.[59]

Rule 60(b) requires that the motion be made "within a reasonable time," which may not exceed one year if the motion is based on subsection (1). In addition to the requirements specified in the language of rule 60(b), the courts have uniformly re-

quired that one seeking relief from a default judgment demonstrate the existence of a meritorious defense. *Barta v. Long,* 670 F.2d 907, 909 (10th Cir.1982).

We turn first to the requirement that defendants must have made a diligent effort to seek relief within a reasonable time. The record shows that the rule 60(b) motions were filed within six or seven months after the entry of the default judgments. The trustee has not argued that the appellants failed to meet the timeliness requirement. We therefore find that the appellants met the first requirement for relief under rule 60(b).[60]

The second element a movant must demonstrate in a motion to vacate a default judgment is an acceptable reason for the default.[61] The trustee contends that the defendants failed to allege or otherwise show the existence of mistake, inadvertence, excusable neglect or other justifiable grounds for vacating the default judgments and that the bankruptcy court was therefore correct in denying their motions. We disagree. The record, particularly when viewed in light of the circumstances leading to the entry of the default judgments, demonstrates that the defendants fulfilled their burden of demonstrating a good and acceptable reason for the default.

The defendants' memoranda in support of their motions to set aside the default

---

**59.** Subsections (2) through (5) of rule 60(b) are not applicable to these appeals.

**60.** Since we find that the defendants' motions were filed within both one year and a reasonable time, we need not choose between subsections (1) and (6) on this point. If the defendants met the substantive requirements of either subsection, they were entitled to relief. *See Feliciano v. Reliant Tooling Co.*, 691 F.2d 653, 656 (3d Cir.1982).

**61.** As indicated above, the justifications listed in rule 60(b)(1) and (6) are most relevant to this case. It is generally accepted, however, that rule 60(b)(6) may not be used as a substitute for appeal. *Collins v. City of Wichita*, 254 F.2d 837, 839 (10th Cir.1958). This principle narrows the issues that we may consider on this appeal. Had appellants directly appealed from the default judgments, it would have been appropriate for them to attack the basis for those judgments.

For example, they could have argued that striking the pleadings was improper because there was no specific evidence presented by the trustee that the pleadings were sham and false. They could also have argued that the sanctions imposed for the unauthorized practice of law were imposed on the wrong individuals; while it is arguable that sending the letter to "all creditors of Universal Clearing House and Independent Clearing House" constituted the giving of legal advice by nonlawyers, it is clear that the defendants who merely filed answers on their own behalf were not engaging in the unauthorized practice of law. Because this is not a direct appeal, those issues are not before us. The only issue is whether the bankruptcy court abused its discretion in denying the motions to vacate the default judgments. The correctness of the original entry of the default judgments is not before this court except as it relates to the defendants' reasons for failing to answer the complaint a second time.

judgments set forth acceptable justifications for the default. The memoranda point out the unusual, confusing and emotional circumstances in which these adversary proceedings arose, the fact that the defendants *did* respond to the complaints and the fact that, at all times, the trustee was aware that the defendants were actively opposed to a judgment in favor of the trustee. These facts, coupled with the fact that the defendants were acting *pro se*, substantiated the claim made at the time of their rule 60(b) motion that "the court should certainly consider defendant's failure to further respond to the court's order to file an 'appropriate response' a product of confusion or ignorance on behalf of defendants as opposed to any willfulness." Memorandum in Support of Motion to Set Aside Default Judgment at 13.[62] We find that the defendants sufficiently demonstrated excusable neglect as required by subsection (1). In the alternative, we find that the circumstances leading to the entry of the judgments, the resulting emotionalism and the inequities that would result. were the default judgments not vacated constitute an independent reason for relief under subsection (6).

The final element a movant must demonstrate in order to justify relief under rule 60(b) is the existence of a meritorious defense to the claim against him. The trustee alleges that the defendants failed to meet their burden of demonstrating a meritorious defense. A review of the record, however, leads to the contrary conclusion.

In their memoranda supporting their motion to vacate the default judgments, the defendants relied on the August 6 decision of the bankruptcy court in related cases to demonstrate the existence of a meritorious defense to the trustee's claims.[63]

The trustee argues that the August 6 decision is not relevant to the rule 60(b) motion and that, by relying on the decision as a ground for vacating the default judgments, the appellants are trying to use rule 60(b) as a substitute for appeal. He further argues that a change in the law or in the judicial view of a rule of law is not an extraordinary circumstance alone justifying relief under rule 60(b).[64] However, the defendants were not asking the bankruptcy court to vacate the default judgments merely because of the existence of the August 6 decision. They were asking the court to vacate the default judgments because they had demonstrated a good and acceptable reason for the default *and* because the court's holding in similar cases demonstrated the existence of a meritorious defense. We agree that the defendants established the existence of a meritorious defense to at least the trustee's third claim.

We hold that the trial court failed to exercise sound discretion when it denied the defendants' motion to set aside the default judgments. The defendants clearly made the requisite showing to justify a ruling in their favor on the rule 60(b) motions. This, in combination with the unusual factual situation that resulted in the default judgments and the well-recognized policy favoring the resolution of cases on their merits rather than by default, mandates a holding at odds with the holding of the bankruptcy court. These cases are

---

**62.** Several courts have found confusion or ignorance on the part of defendants to be sufficient grounds for vacating default judgments. *See, e.g., United Artists Corp. v. Freeman,* 605 F.2d 854, 857 (5th Cir.1979); *Castro v. Saudi Arabia,* 510 F.Supp. 309, 313 (W.D.Tex.1980); *Kinnear Corp. v. Crawford Door Sales Co.,* 49 F.R.D. 3, 6 (D.S.C.1970).

**63.** As we have seen, in its August 6 decision the bankruptcy court granted the trustee's motion for summary judgment on his first two claims for relief and granted summary judgment to the defendants on the third claim in those cases in which default judgments had not been entered. *Merrill v. Abbott (In re Independent Clearing House Co.),* 41 B.R. 985 (Bankr.D.Utah 1984).

**64.** The trustee cites *Collins,* 254 F.2d at 839, and *EEOC v. Safeway Stores, Inc.,* 611 F.2d 795, 800 (10th Cir.1979), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 809 (1980), for the proposition that rule 60(b) should not be used as a substitute for appeal. These cases are inapposite to the case at bar in that they involve the resolution of a case on its merits and a motion to vacate the judgment on account of a change in the law. In this case, however, the case was not resolved on its merits and the appellants are not contending that the applicable rule of law was changed by the August 6 decision. The appellants point to the August 6 decision merely to demonstrate the existence of a meritorious defense to the trustees' third claim.

therefore remanded for consideration on their merits.

## VII.

### ILLEGALLY SEIZED EVIDENCE

 The defendants-appellants represented by Edwin F. Guyon also allege, for the first time on appeal, that their constitutional rights were violated by the use of evidence that was obtained through searches violative of the fourth amendment. The evidence in question is business records of the debtors seized in connection with the criminal investigation of the debtors' principals. We hold that the defendants' argument is without merit. We further question the defendants' standing to raise such a claim.

The most glaring defect in the defendants' argument is the fact that the Tenth Circuit has determined that the evidence was not improperly seized. *United States v. Cardall,* 773 F.2d 1128 (10th Cir.1985). But even if a fourth amendment violation had occurred, the defendants' argument would still not be well taken because they have not demonstrated the "expectation of privacy" necessary for standing to challenge the legality of the searches involved. In *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court held that in order to challenge the legality of a search or seizure, a person must show that he had a "legitimate expectation of privacy in the invaded place." 439 U.S. at 143, 99 S.Ct. at 430. *See also Rawlings v. Kentucky,* 448 U.S. 98, 105, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *United States v. Salvucci,* 448 U.S. 83, 90, 100 S.Ct. 2547, 2552, 65 L.Ed.2d 619 (1980). There has been no showing, and we believe the defendants would be hard pressed to demonstrate, that the defendants in this case had an expectation of privacy in the business offices of the clearinghouses or in the business records seized.

Not only is the defendants' argument without merit, it is also untimely. The constitutionality of the searches was not raised in the bankruptcy court and thus "need not be considered on appeal." *Ke-*

*nai Oil & Gas, Inc. v. Department of the Interior,* 671 F.2d 383, 388 (10th Cir.1982).

## VIII.

### CONCLUSION

In summary, this court holds as follows:

1. The debtor entities—Independent Clearing House Company, Universal Clearing House Company and Accounting Services Company—are "debtors" within the meaning of section 301 of the Code and hence are entitled to bankruptcy relief.

2. The debtors' allegedly bad-faith filing of their petition in bankruptcy did not deprive the bankruptcy court of subject matter jurisdiction over these cases.

3. Section 550(e) does not bar the trustee from recovering the avoided transfers.

4. The money the trustee seeks to recover was "property" of the debtors within the meaning of sections 547 and 548 of the Code.

5. The trustee can recover, under sections 548 and 544 of the Code, the value of all transfers to a defendant made within one year of the debtors' filing for bankruptcy to the extent the transfers exceeded the defendant's undertaking.

6. All other transfers to a defendant made within one year of the debtors' filing for bankruptcy were made with the actual intent to hinder, delay or defraud creditors and hence are avoidable under section 548 (except to the extent the defendant can prove that he took in good faith) and under section 544 and the Utah Fraudulent Conveyance Act (except to the extent the defendant did not have previous notice of the debtors' fraudulent intent).

7. All transfers to defendants made within ninety days of the debtors' filing their petitions in bankruptcy were preferential under section 547(b).

8. The bankruptcy court erred in concluding that, as a matter of law, the transfers could not come within the ordinary course of business exception of section 547(c)(2). On remand, the defendants under the trustee's first claim should have a chance to prove that the transfers to them meet all the requirements of section 547(c)(2).

9. To the extent the bankruptcy court properly granted summary judgment to the trustee, it did not err in also awarding him prejudgment interest.

10. The record did not support the grant of summary judgment in the case of appellant Van Sant (and any other defendants whose names appear in both exhibit D and exhibit E of the Bagley affidavit).

11. The bankruptcy court erred in failing to recognize appellant Van Sant's recoupment defense.

12. The bankruptcy court erred in granting summary judgment against appellant Thomas Richards in the amount of $8,633.60. The amount should be $1,533.60.

13. The bankruptcy court erred in denying the motion of certain defendants to set aside the default judgments entered against them.

14. The use of the debtors' records as evidence did not violate any constitutional right of the defendants.

This court has earnestly sought to do justice among all the parties to these actions as well as among those creditors who are not parties but whose interests the trustee is charged with representing. The perfidy of the perpetrators of this scheme, however, has made that goal virtually impossible of achievement.

The ideal solution, of course, would be for all undertakers to get back their original undertaking. But that solution presupposes that the original undertakings are still around to be gotten back, and it is clear that they are not. Some of the money has gone to pay the debtors' administrative expenses, the living expenses of the debtors' principals, commissions to the debtors' salespeople and fictitious profits to early undertakers who are outside the reach of the bankruptcy code. Moreover, any attempt to retrieve these monies (or their equivalent) must necessarily involve resort to the courts, which does not come cheaply.

The next best solution would be for everyone to share pro rata in the inevitable losses. In theory, this solution is what the trustee sought by his third cause of action: all undertakers would put back on the shelf what they had received, and the trustee would redistribute the money equitably. In fact, however, many undertakers who received payments before September 1980 are not parties to these actions, so even if all the defendants returned their money, it would not represent all payments to undertakers.

Unable to do perfect justice, this court must do the only thing it can do—namely, apply the applicable law to the facts of the case, on the assumption that that law will best approximate justice.

The applicable law in this case is the bankruptcy code. That law is premised on certain assumptions that may not be true in a case such as this. For example, the Code establishes an arbitrary date before which transfers by the debtor are conclusively presumed to have been legitimate—namely, one year before the debtor files for bankruptcy. Such a bright-line standard, like a statute of limitation or repose, gives certainty and finality to business transactions. However, the presumption simply does not apply to a Ponzi scheme, where, by definition, *all* transfers by the debtor are fraudulent. Arguably, therefore, the trustee should be able to recover all transfers without regard for the one-year limitation period. But under the current Code, in an adversary action he cannot. Moreover, by definition all transfers in furtherance of a Ponzi scheme are preferential, yet under

the Code the trustee may recover only those transfers made within ninety days before bankruptcy. Although he may recover earlier transfers as fraudulent conveyances, a defendant may keep such transfers to the extent he gave value for the transfer and took it in good faith. In short, the Code simply does not provide an effective way for the trustee to recover all transfers in furtherance of a Ponzi scheme. If Congress desires such a result, it may need to amend the Code.

Because of the immensity of the bankruptcy proceedings and the complexity of the issues on appeal, these adversary proceedings have already been in the judicial mill a long time. Now we must send them back to the bankruptcy court for further proceedings, further delaying the process. We can only offer the consolation that Mr. Vholes offered Richard Carstone in other protracted litigation: "The suit does not sleep; we wake it up, we air it, we walk it about. *That's* something. . . . Nobody has it all his own way now, sir. And *that's* something, surely." C. Dickens, *Bleak House* 559 (Signet ed. 1964).

AFFIRMED in part, REVERSED in part and REMANDED for further proceedings consistent with this opinion.

## APPENDIX A

| Bankruptcy Court No. (83PA–) | District Court No. (C–84–) | Defendant (Merrill v.) [Attorney][1] | Claims |
|---|---|---|---|
| 2008 | 0841W | *Paul Hurst [EFG] | 1, 3 |
| 2828 | 0896G | David Abbott, Briant Summerhays, Summerhays Music & Related Cos. Retirement Plan | 1, 3 |
| 2100 | 0927W | Juliet Keller [DWJ] | 1, 3 |
| 2105 | 0930J | Ron or Barbara Kendrick [DWJ] | 1, 3 |
| 2114 | 0935W | Randall Kilmer [DWJ] | 1, 2, 3 |
| 2120 | 0938J | Eleanore S. Kinslow | 1, 3 |
| 2126 | 0941W | Richard Kent Kleffman | 3 |
| 2135 | 0943W | Gregory or Joyce Knott [DWJ] | 1, 3 |
| 2144 | 0944J | Merle Krause [DWJ] | 1, 3 |
| 2177 | 0950J | Veda A. Lemmon [DWJ] | 3 |
| 2189 | 0954J | Eusebio Limas [DWJ] | 3 |
| 2190 | 0955W | Linda Hansen or Valorie Jones [GAF] | 2 |
| 2192 | 0956J | Don Lindley [GAF] | 1, 3 |
| 2193 | 0957W | Richard Little [DWJ] | 1, 2, 3 |
| 2208 | 0959W | Debbie Lovejoy and Sherman & Company [RL] | 1, 3 |
| 2221 | 0967W | Lowell Lundell [DWJ] | 1, 3 |
| 2222 | 0968J | Aaron Madsen | 3 |
| 2225 | 0969W | Maria Madsen [DWJ] | 3 |
| 2242 | 0971W | Ammon Manning [GAF] | 3 |
| 2243 | 0972J | Christina Manning [GAF] | 3 |
| 2244 | 0973W | David K. Manning [EFG] | 1, 2, 3 |
| 2245 | 0974J | Gary Manning [GAF] | 2 |
| 2246 | 0975W | Glenn or Thelma Manning [EFG] | 1, 3 |
| 2250 | 0976J | Clairmont or Marian Margetts [DWJ] | 3 |
| 2264 | 0984J | J. Lowell Maughn [DWJ] | 3 |
| 2289 | 0991W | Dr. & Mrs. Dan McKinney [DWJ] | 3 |
| 2290 | 0992J | Richard McKinney [DWJ] | 3 |

| Bankruptcy Court No. (83PA–) | District Court No. (C–84–) | Defendant (Merrill v.) [Attorney][1] | Claims |
|---|---|---|---|
| 2293 | 0993W | Harry McMurdie [GAF] | 1, 3 |
| 2296 | 0995W | Margaret Meakin [DWJ] | 1, 3 |
| 2298 | 0996J | Mo & Sun Cho Meerza [GAF] | 2 |
| 2321 | 1003W | Douglas or Ruth Miller [LRM] | 3 |
| 2324 | 1005W | Flora Miller [DWJ] | 1, 3 |
| 2335 | 1008J | Dena, Kristine or Jay Mitchell [DWJ] | 3 |
| 2340 | 1009W | Anna M. Molitor | 3 |
| 2343 | 1010J | Pres or Linda Montoya [DWJ] | 1, 3 |
| 2354 | 1012J | Bill Morgan [DWJ] | 1, 3 |
| 2357 | 1014J | Dave Morris [DWJ] | 1, 3 |
| 2372 | 1018J | Layne Murdock [DWJ] | 1, 3 |
| 2373 | 1019W | Leaman E. or Pearl Murphy [DWJ] | 1, 3 |
| 2378 | 1021W | Homer L. Nabholtz [DWJ] | 1, 3 |
| 2379 | 1022J | Andrew J. Nabholtz [DWJ] | 3 |
| 2398 | 1029W | Donna, Corey or Francis Newman [DWJ] | 1, 3 |
| 2405 | 1058J | Dennis Nichols [DWJ] | 3 |
| 2431 | 1064J | Cecil or Bobby O'Dell [DWJ] | 1, 3 |
| 2438 | 1065W | Maeser or Dorene Okerlund [DWJ] | 2, 3 |
| 2440 | 1066J | Joseph or Carolyn Olschewski [DWJ] | 3 |
| 2445 | 1068J | Vern T. Olson [DWJ] | 3 |
| 2479 | 1077W | Cyril or Ada Payne | 3 |
| 2480 | 1078J | Leon Payne | 1, 3 |
| 2481 | 1079W | Leon or George Payne [EFG] | 2 |
| 2485 | 1080J | Paul M. or Della Pease [DWJ] | 3 |
| 2495 | 1083W | Jose Perez [DWJ] | 1, 3 |
| 2499 | 1084J | Betty Jean Peterson [GAF] | 1, 3 |
| 2607 | 1085W | Boyd J. Ricks | 1, 3 |
| 2628 | 1094J | Paul Robinson [DWJ] | 3 |
| 2631 | 1095W | Norman or Janice Roehr [DWJ] | 3 |
| 2638 | 1097W | Norman H. or Velva Lee Rose | 1, 3 |
| 2639 | 1098J | Jeanetta or Smith H. Rose [GAF] | 1, 3 |
| 2643 | 1100J | William Roskelly | 1, 3 |
| 2650 | 1101W | R. J. Rucker [GAF] | 2 |
| 2652 | 1102J | Cressent, Craig or Brian Rupp [GAF] | 3 |
| 2653 | 1103W | Duane or Judy Rupp [GAF] | 2 |
| 2657 | 1104J | Jeanne Ryan | 3 |
| 2660 | 1105W | Robert or Rula Sacco [DWJ] | 3 |
| 2661 | 1106J | J. Elmo or Blanche J. Sager [DWJ] | 3 |
| 2663 | 1107W | Mucio Salazar [DWJ] | 1, 3 |
| 2667 | 1108J | Clifford or Cleo Samsell [GAF] | 1, 3 |
| 2685 | 1116J | Virgil N. Sayre [DWJ] | 1, 3 |
| 2689 | 1117W | Susan or Sherri Schmauderer [DWJ] | 1, 3 |
| 2694 | 1120J | John Schuler [GAF] | 2, 3 |
| 2699 | 1122J | Daniel or Nancy Scott [DWJ] | 3 |
| 0987 | 1137W | George Carpenter and Adam & Truet, a Trust [DWJ] | 1, 3 |
| 0990 | 1139W | Al Toronto, Alpine Enterprises [DWJ] | 1, 3 |
| 0994 | 1141W | Tom Garza, American Investments [DWJ] | 1, 3 |
| 0995 | 1142J | Ariel Anderson Family Trust | 3 |
| 0999 | 1143W | Robert Mixdorf, Beecie Enterprises | 1, 3 |
| 1309 | 1147W | E.M. or Dorothy Blackburn [GAF] | 1, 3 |
| 1344 | 1154J | Dee C. Brown [GAF] | 1, 3 |
| 1351 | 1158J | Marvin or Diane Brown [DWJ] | 1, 3 |

| Bankruptcy Court No. (83PA–) | District Court No. (C–84–) | Defendant (Merrill v.) [Attorney][1] | Claims |
|---|---|---|---|
| 1372 | 1166J | Sheila Bugger [DWJ] | 3 |
| 1376 | 1167W | L. Ross or Dorothy Burningham [DWJ] | 1, 3 |
| 1391 | 1171W | Eugene Campbell [DWJ] | 3 |
| 1397 | 1175W | Jimmy or Kaye Carlile | 1, 3 |
| 1399 | 1176J | Carol Stafford or Jane Green [DWJ] | 3 |
| 1500 | 1177W | Clark Colson [DWJ] | 1, 3 |
| 1501 | 1178J | Ronnie or Inois Colson [DWJ] | 1, 3 |
| 1520 | 1184J | Josephine or Artie Cox [DWJ] | 3 |
| 1523 | 1185W | Harold or Dorothy Crays [DWJ] | 1, 3 |
| 1524 | 1186J | Lori Lea Crays [DWJ] | 1, 3 |
| 1532 | 1188J | Keig Crook [DWJ] | 2, 3 |
| 1568 | 1196J | Farrice F. Davidson [DWJ] | 1, 3 |
| 1579 | 1199W | Wilma Davis | 3 |
| 1591 | 1202J | Connie Della Lucia [DWJ] | 1, 3 |
| 1592 | 1203W | Orlando Della Lucia [DWJ] | 3 |
| 2718 | 1220J | Blair Shaw [EFG] | 2 |
| 2837 | 1221W | David W. or DeVon Tanton [EFG] | 1, 3 |
| 2914 | 1225G | Ruby K. Van Sant [GRA] | 1, 2, 3 |
| 2505 | 1245W | D. Scott Peterson [DWJ] | 3 |
| 2509 | 1247W | Isobel Peterson | 1, 3 |
| 2516 | 1248J | Billy or Margie Phillips [DWJ] | 1, 3 |
| 2517 | 1249W | Brad Phillips [DWJ] | 3 |
| 2535 | 1252J | William or Johanna Pogue [DWJ] | 1, 3 |
| 2536 | 1253W | David Pollock [GAF] | 2 |
| 2541 | 1255W | Garth Porter, Spiders Webb [GAF] | 1 |
| 2542 | 1256J | Keith C. Porter [GAF] | 3 |
| 2543 | 1257W | Kenneth S. Porter [GAF] | 1, 3 |
| 2544 | 1258J | Kent C. Porter [GAF] | 1, 3 |
| 2545 | 1259W | Mark C. Porter [GAF] | 3 |
| 2559 | 1262J | Gene G. or Marlene W. Powell [DWJ] | 1, 3 |
| 2561 | 1263W | Dayna or Don Price [DWJ] | 1, 3 |
| 2567 | 1267W | Becky Pugh [DWJ] | 3 |
| 2568 | 1268J | W.E. or Maudine Pugh [DWJ] | 1, 3 |
| 2574 | 1270J | Madelyn Rapp [DWJ] | 1, 3 |
| 2582 | 1272J | James or Sybil Raymer [DWJ] | 1, 3 |
| 2584 | 1273W | G. Scott or Vickie Reading [DWJ] | 1, 3 |
| 2585 | 1274J | Francis or Doris Rector [DWJ] | 1, 2, 3 |
| 2587 | 1275W | Arvel or Jene Reese [DWJ] | 3 |
| 2588 | 1276J | Cindy Reese [GAF] | 1, 3 |
| 2709 | 1285W | Jay Kay Seymour [DWJ] | 3 |
| 2711 | 1286J | E. C. Shaffer [DWJ] | 1, 2, 3 |
| 2712 | 1287W | Dan Shaffer [DWJ] | 1, 3 |
| 2725 | 1289W | Floyd Sheppick [DWJ] | 1, 3 |
| 2735 | 1291W | Lois A. or Owen K. Shupe [GAF] | 1, 3 |
| 2744 | 1292J | Cotton Sims [DWJ] | 1, 2, 3 |
| 2745 | 1293W | Mickey Simms [DWJ] | 1, 2, 3 |
| 2767 | 1298J | Larry M. or Rae Ellen M. Smith [DWJ] | 1, 3 |
| 2774 | 1300J | Yvonne Smith [DWJ] | 1, 3 |
| 2776 | 1301W | Claine or Helen Snow [GAF] | 1 |
| 2783 | 1304J | Gerald Sorenson | 2, 3 |
| 2785 | 1305W | Letitia Sorenson [GAF] | 3 |
| 2788 | 1306J | Joseph L. or Doris Southworth [DWJ] | 1, 3 |
| 2791 | 1307W | Vera Sperber [DWJ] | 1, 3 |

| Bankruptcy Court No. (83PA-) | District Court No. (C-84-) | Defendant (Merrill v.) [Attorney][1] | Claims |
|---|---|---|---|
| 2794 | 1308J | Carol Stafford [DWJ] | 1 |
| 2796 | 1309W | Robert T. Stancil [DWJ] | 1, 3 |
| 2801 | 1312J | Richard Stansell [DWJ] | 1, 3 |
| 2803 | 1313W | William L. Stapleton [DWJ] | 3 |
| 2805 | 1314J | Rita Starr | 3 |
| 2813 | 1315W | Owen R. or Dona W. Stokes [GAF] | 1, 3 |
| 2816 | 1317W | Phyllis & Dean Stonier | 1, 3 |
| 2821 | 1318J | Della Stringer [DWJ] | 1, 3 |
| 2838 | 1321W | Jesus Tarin [DWJ] | 1, 3 |
| 2843 | 1323W | Glen S. or Elizabeth A. Taylor [TST] | 3 |
| 2844 | 1324J | J. Ross or Ellen S. Taylor [GAF] | 3 |
| 2845 | 1325W | Lindsey Taylor [DWJ] | 3 |
| 2848 | 1327W | Ruth Taylor [GAF] | 1, 3 |
| 2849 | 1328J | Dan E. Telford [DWJ] | 1, 3 |
| 2858 | 1330J | Rochelle, Doug, June or Frank Thome | 3 |
| 2860 | 1331W | Bill or Tracy Thompson [GAF] | 3 |
| 2863 | 1332J | Edwin L. or Janice L. Thompson | 1, 3 |
| 2864 | 1333W | Gerald Thompson [DWJ] | 1, 2, 3 |
| 2873 | 1334J | William G. or Laura M. Timmins [GAF] | 1, 3 |
| 2877 | 1335W | Garth or Beulah Tolboe [GAF] | 3 |
| 2882 | 1336J | B. Kent or Dorothy Tonnies [DWJ] | 1, 3 |
| 2888 | 1338J | Dan Trankle [GAF] | 2 |
| 2895 | 1339W | William Tucker [GAF] | 3 |
| 3008 | 1342J | Clinton or Peggy Williams | 1, 3 |
| 3014 | 1344J | Mark Wilson [GAF] | 1, 3 |
| 3024 | 1349W | Elsie N. Yost [DWJ] | 1, 3 |
| 3029 | 1352J | Douglas L. Wood | 3 |
| 3059 | 1362J | Marie T. or Carolyn Yee [DWJ] | 1, 3 |
| 3060 | 1363W | Robyn York [GAF] | 1, 3 |
| 3064 | 1364J | Dee B. or Lucille Young [GAF] | 1, 3 |
| 1002 | 1366J | Cheryl Moffitt, Bertco [JHM] | 3 |
| 1003 | 1367W | John Dichler, Caernarvon Securities | 3 |
| 1007 | 1368J | Jerry Ewy, Certified Transmission Rebuilder | 1, 3 |
| 1026 | 1369W | Cyril Stevenson, Daws Properties | 1, 2, 3 |
| 1047 | 1370J | Val Bentley & Hil-Tac Holding Trust | 1, 3 |
| 1048 | 1371W | Joe Hill, Hilco | 3 |
| 1082 | 1372J | Mois or Mae Gerson Trust | 3 |
| 1083 | 1373W | Val Bentley, Motherlode Consultants | 1, 3 |
| 1091 | 1374J | Novak Company | 1, 3 |
| 1413 | 1375W | Don J. or Gladys S. Chadwick [DWJ] | 1, 3 |
| 1414 | 1376J | Julie Ann Chadwick [DWJ] | 3 |
| 1415 | 1377W | Neil S. Chadwick [DWJ] | 1, 3 |
| 1416 | 1378J | Reed S. or Sandra M. Chadwick [DWJ] | 3 |
| 1450 | 1380J | Ellen or Mable Christensen [GAF] | 3 |
| 1460 | 1383W | Jeanne or Matthew Clarke [GAF] | 1, 3 |
| 1479 | 1385W | Michelle Colby [GAF] | 1, 3 |
| 1492 | 1387W | Carl E. Collins [WKG] | 1, 3 |
| 1705 | 1389W | Madelyn or Joseph Fedor [GBH] | 3 |
| 1708 | 1390J | Jean Campbell Fenn [DWJ] | 3 |
| 1751 | 1397W | Jerry Fridenstine | 1, 3 |
| 1785 | 1401W | Shirley Johns or Gary Bozarth | 1, 3 |

| Bankruptcy Court No. (83PA–) | District Court No. (C–84–) | Defendant (Merrill v.) [Attorney][1] | Claims |
|---|---|---|---|
| 1795 | 1404J | Frank or Florence Gerner [JD] | 3 |
| 1830 | 1406J | Marcus or D.L. Graves | 3 |
| 1848 | 1407W | Mary Gulesserian | 3 |
| 1875 | 1409W | Gordon Hansen | 1, 3 |
| 1894 | 1413W | Marilyn Harper [GAF] | 3 |
| 1895 | 1414J | Rulon Harper | 1 |
| 1896 | 1415W | Duane or Barbara A. Harris | 1, 3 |
| 1019 | 1416J | Nora Grayum, D&J, Inc. [GAF] | 1, 3 |
| 1036 | 1418J | Glenn's Garage [GAF] | 1, 3 |
| 1062 | 1421W | Dave Manning, Joycom Co. [EFG] | 1, 3 |
| 1106 | 1422J | Sherm Davidson, Portland Trust [HRK] | 1, 3 |
| 1113 | 1424J | Rivendale Management Co. [GAF] | 2 |
| 1116 | 1425W | Rucker Soil Service [EFG] | 2, 3 |
| 1118 | 1426J | Rulon J. Harper Trust | 3 |
| 1128 | 1427W | Ray Manning, Spring Hill, a trust [EFG] | 1, 3 |
| 1131 | 1428J | Dave Manning, Star West Co. [EFG] | 1, 2, 3 |
| 1150 | 1430J | Patrick O. Nugent (Western Management Consultants) | 1, 3 |
| 1170 | 1432J | Chad, Lena or Clay Allen [GAF] | 1, 2, 3 |
| 1174 | 1433W | Mark D. or Flossie Allen [GAF] | 3 |
| 1183 | 1434J | Carol or Lee Anderson [DWJ] | 1 |
| 1200 | 1440J | Don Andrews [DWJ] | 1, 3 |
| 1201 | 1441W | Donald or Marilyn Andrews [DWJ] | 1, 3 |
| 1217 | 1445W | David Ashby | 2 |
| 1219 | 1446J | Kent Ashton | 1, 3 |
| 1222 | 1447W | Keith or Sue Atkinson | 1, 3 |
| 1232 | 1449W | Don J. or Maurine C. Baird [GAF] | 1, 3 |
| 1238 | 1450J | J. Clarence or Vera Mae Ballard [DWJ] | 1, 3 |
| 1244 | 1451W | Monty P. or Jane P. Banks | 1, 3 |
| 1247 | 1452J | Allan R. or Erma Barfuss [GAF] | 1, 3 |
| 1248 | 1453W | Bryce or Sherie Barfuss [GAF] | 3 |
| 1249 | 1454J | Glenn or Beverly Barfuss [GAF] | 1, 3 |
| 1278 | 1459W | Thomas E. Beck | 3 |
| 1284 | 1460J | E. Darwin Belnap [MB] | 3 |
| 1294 | 1463W | Christopher Bentley | 3 |
| 1621 | 1465W | DeAnn D. or John W. Doramus [GAF] | 1, 3 |
| 1623 | 1467W | Kim L. or John W. Doramus | 1, 3 |
| 1904 | 1469W | Jim Hart [DWJ] | 1, 3 |
| 1907 | 1471W | Michael Harvey [GAF] | 3 |
| 1912 | 1472J | John Hawe [GAF] | 3 |
| 1913 | 1473W | Allen or Faye Hawley [DWJ] | 1, 3 |
| 1917 | 1475W | Frank Healy | 1, 3 |
| 1918 | 1476J | Faron or Shirley Heap [DWJ] | 3 |
| 1931 | 1481W | Daniel Helle [DWJ] | 1, 3 |
| 1945 | 1484J | Joe Hill | 2 |
| 1951 | 1486J | Blanche or Clifford Hines [DWJ] | 1, 3 |
| 1957 | 1489W | C. Hoffman [DWJ] | 1, 2, 3 |
| 1967 | 1491W | A.A. Holmberg [DWJ] | 1, 3 |
| 1976 | 1492J | Helen Hoopes [DWJ] | 3 |
| 1981 | 1495W | Barth Howard [GAF] | 1, 3 |
| 1982 | 1496J | Clarence or Arlene Howard [GAF] | 2 |
| 1983 | 1497W | David or Karen Howard [GJE] | 1, 2 |
| 1984 | 1498J | O. Ellis Howard [GAF] | 2, 3 |

| Bankruptcy Court No. (83PA–) | District Court No. (C–84–) | Defendant (Merrill v.) [Attorney][1] | Claims |
|---|---|---|---|
| 1986 | 1500J | Sharee Howard [GJE] | 1 |
| 1987 | 1501W | SueAnn, David, James, Janell, Lynnae & Karen Howard [GJE] | 3 |
| 1992 | 1502J | Sandra or Felix Huebner [DWJ] | 1, 3 |
| 1998 | 1504J | Max F. or Deon N. Hull [GAF] | 3 |
| 2006 | 1505W | Linda Hunt [DWJ] | 1, 3 |
| 2019 | 1508J | Casper or Nyla Jacobs [DWJ] | 1, 3 |
| 2025 | 1510J | Willie James [DWJ] | 1, 3 |
| 2029 | 1512J | Devon Craig Jarvis [GAF] | 3 |
| 2030 | 1513W | Kenyon Boyd Jarvis [GAF] | 3 |
| 2031 | 1514J | LaMont Radell Jarvis [GAF] | 3 |
| 2032 | 1515W | Terrill Lyn Jarvis [GAF] | 3 |
| 2042 | 1517W | Harry Ray Jesko [DWJ] | 1, 2, 3 |
| 2044 | 1518J | Stanley or Corrine Joe [DWJ] | 1, 3 |
| 2054 | 1523W | Gaylen M. or Alaire L. Johnson [DWJ] | 3 |
| 2058 | 1525W | John C. or Alice Johnson [DWJ] | 1, 3 |
| 2064 | 1526J | William A. or Bobbie D. Jolly [DWJ] | 3 |
| 2066 | 1527W | Cecil or Ann Jones [DWJ] | 3 |
| 2086 | 1534J | K. Dale or Elizabeth Kartchner [DWJ] | 1, 3 |
| 2088 | 1535W | Janice Kay Kaupanger | 3 |
| 2089 | 1536J | Bessie Kay [GAF] | 3 |
| 2090 | 1537W | Jenifer or Mable Kay [GAF] | 3 |
| 2091 | 1538J | Lydia L. Kay [GAF] | 1, 3 |
| 2094 | 1539W | Laurence T. Keene [DWJ] | 1, 3 |
| 2099 | 1541W | Jim Keller [DWJ] | 1, 3 |
| 2910 | 1545W | Byron or Jennie Vance [DWJ] | 1, 3 |
| 2920 | 1548J | Donna H. Vest | 3 |
| 2923 | 1549W | Rudy or Dorothy Wagner [DWJ] | 1, 3 |
| 2932 | 1550J | Kristeen Walker | 3 |
| 2942 | 1552J | Ray H. Walton [DWJ] | 1, 3 |
| 2945 | 1553W | George W. Ward [DWJ] | 3 |
| 2952 | 1556J | M.J. Waters [DWJ] | 3 |
| 2957 | 1557W | Florence Watson [DWJ] | 1, 3 |
| 2960 | 1558J | Larry O. & Fae Charlene Wayman | 1, 2, 3 |
| 2963 | 1559W | Howard T. or F. Betty Weaver, Jr. [DWJ] | 1, 3 |
| 2975 | 1561W | James L. Werner [DWJ] | 3 |
| 2983 | 1563W | Cloy Weston [GAF] | 1, 3 |
| 2986 | 1564J | Walter Wheeler [DWJ] | 3 |
| 2990 | 1566J | F.C. or A.L. White [DWJ] | 1, 3 |
| 2992 | 1567W | Dexter W. Whitehead [DWJ] | 3 |
| 1001 | 1583W | Bella Enterprises [DWJ] | 1, 3 |
| 1012 | 1584J | Clyde L. or Ada C. Porter Trust [DWJ] | 3 |
| 1024 | 1587W | Davidson & Bisset [DWJ] | 3 |
| 1025 | 1588J | Davis & Garret Co. [DWJ] | 1, 3 |
| 1041 | 1589W | H. Whitney Chapman Family Trust [DWJ] | 1, 3 |
| 1043 | 1591W | Havilah [DWJ] | 1, 3 |
| 1049 | 1592J | Homemaker Enterprises [DWJ] | 1, 3 |
| 1050 | 1593W | Homes & Short [DWJ] | 2 |
| 1051 | 1594J | Howard & Grishman Company [DWJ] | 1, 3 |
| 1054 | 1595W | In G.I.T. [DWJ] | 1, 3 |

| Bankruptcy Court No. (83PA–) | District Court No. (C–84–) | Defendant (Merrill v.) [Attorney][1] | Claims |
|---|---|---|---|
| 1057 | 1596J | J. Lowell Maughan Family Estate [DWJ] | 3 |
| 1066 | 1597W | Kilebrew & Feverman Co. [DWJ] | 3 |
| 1070 | 1598J | Lava I Am Sanctuary [DWJ] | 3 |
| 1089 | 1601W | New Horizon Company Trust [DWJ] | 3 |
| 1097 | 1602J | Odyssey [DWJ] | 1, 3 |
| 1101 | 1603W | Paul H. Robinson Child, Trust [DWJ] | 3 |
| 1103 | 1604J | Peruvian Missionary Fund [DWJ] | 3 |
| 1109 | 1606J | Pro Company [DWJ] | 1, 2, 3 |
| 1130 | 1608J | Stapleton & Associates [DWJ] | 1, 3 |
| 1147 | 1610J | WACCO Enterprise [DWJ] | 1, 3 |
| 1151 | 1611W | Wisdom & Howard Company [DWJ] | 1, 3 |
| 1162 | 1612J | Bobby Dwain & Adelia Milligan [DWJ] | 3 |
| 1168 | 1613W | Ethel Jane Alexander [DWJ] | 3 |
| 1194 | 1614J | John D. Anderson [DWJ] | 3 |
| 1203 | 1616J | Everett & Tillie Anglin [DWJ] | 1, 3 |
| 1205 | 1618J | Don or Ruth Anson [DWJ] | 3 |
| 1253 | 1623W | Thurman Barker [DWJ] | 2, 3 |
| 1254 | 1624J | Colonel Merrill Barlow [DWJ] | 1, 3 |
| 1255 | 1625W | Frances Barlow [DWJ] | 3 |
| 1256 | 1626J | Joel Barlow [DWJ] | 1, 2, 3 |
| 1272 | 1628J | Eldon Baxter [DWJ] | 3 |
| 1274 | 1629W | James or June Bearden [DWJ] | 1, 3 |
| 1288 | 1630J | Bob Bennett [DWJ] | 1, 3 |
| 1291 | 1631W | Kelly Benson [DWJ] | 2 |
| 1400 | 1648J | Alvin G. Carpenter [DWJ] | 1, 3 |
| 1401 | 1649W | George or Opal Carpenter [DWJ] | 2 |
| 1432 | 1655W | Kenneth R. or Louise A. Chapman [DWJ] | 3 |
| 1433 | 1656J | R.J. Chapman [DWJ] | 3 |
| 1434 | 1657W | Vaughn Chapman [DWJ] | 3 |
| 1435 | 1658J | Vern L. Chapman [DWJ] | 1, 3 |
| 1438 | 1660J | Thane Chase [DWJ] | 3 |
| 1444 | 1662J | H.L. or Faun Childers [DWJ] | 1, 3 |
| 1452 | 1663W | Lee or Sandra Christensen [DWJ] | 3 |
| 1462 | 1664J | T.J. Clay [DWJ] | 2 |
| 1469 | 1665W | Alice Cluff [DWJ] | 3 |
| 1471 | 1667W | C.E. Clutter [DWJ] | 3 |
| 1613 | 1691W | Sam or Lucille Diele [DWJ] | 1, 3 |
| 1647 | 1695W | Kilebrew & Feverman Co. [DWJ] | 1 |
| 1648 | 1696J | Nadean Duran [DWJ] | 1, 3 |
| 1659 | 1698J | Edith Knapp & Gerald Thompson [DWJ] | 3 |
| 1693 | 1701W | Joseph C. Eyring [DWJ] | 1, 2, 3 |
| 1694 | 1702J | K.M. Fackrell [DWJ] | 1, 3 |
| 1712 | 1705W | Ralph & Shirlee Ferrin [DWJ] | 1, 3 |
| 1715 | 1706J | Leland or Barbara Fielden [DWJ] | 1, 3 |
| 1720 | 1707W | Carl Figgins [DWJ] | 2 |
| 1722 | 1708J | Ronald A. Fish [DWJ] | 1, 2, 3 |
| 1725 | 1709W | Gary & Kathleen Flair [DWJ] | 3 |
| 1730 | 1710J | D.J. & Helen Fong [DWJ] | 1, 3 |
| 1739 | 1712J | Robert K. & Mary B. Fox [DWJ] | 1, 3 |
| 1742 | 1714J | Charles Frandsen [DWJ] | 1, 3 |
| 1749 | 1717W | William E. & Betty Jo Freeman [DWJ] | 1, 3 |
| 1752 | 1718J | Jake Z. Friesen [DWJ] | 1, 3 |

| Bankruptcy Court No. (83PA–) | District Court No. (C–84–) | Defendant (Merrill v.) [Attorney][1] | Claims |
|---|---|---|---|
| 1768 | 1721W | John Gaines [DWJ] | 1, 3 |
| 1770 | 1723W | Rosslyn Gaines [DWJ] | 3 |
| 1772 | 1724J | Hector Gamboa [DWJ] | 3 |
| 1773 | 1725W | Jorge Gamboa [DWJ] | 3 |
| 1794 | 1726J | Edward & Kara Gerard [DWJ] | 1, 3 |
| 1796 | 1727W | Martin & Cleatus Gersch [DWJ] | 3 |
| 1798 | 1728J | George R. & Edith W. Gibbons [DWJ] | 1, 3 |
| 1805 | 1729W | Dean & Dollie Glasscock [DWJ] | 1, 3 |
| 1820 | 1733W | Susie A. Gordon [DWJ] | 2 |
| 1857 | 1740J | Gloria A. Gutierrez [DWJ] | 3 |
| 1858 | 1741W | Warner & Elizabeth Hoopes [DWJ] | 1, 2, 3 |
| 1862 | 1742J | C.W. & Lawana Halbert [DWJ] | 1, 3 |
| 1872 | 1743W | Bob & Priscilla Hamman [DWJ] | 1, 2, 3 |
| 2334 | 1818J | Dena & Jay Mitchell [DWJ] | 1 |
| 2547 | 1859W | Linda Poss [DWJ] | 3 |
| 2549 | 1861W | Michael Poss [DWJ] | 1, 3 |
| 2716 | 1893W | Stephen N. & Diane P. Sharp [DWJ] | 3 |
| 2768 | 1899W | Lilith Smith [DWJ] | 1 |
| 3035 | 1940J | Hobart & Jean Woods [DWJ] | 1, 3 |
| 1188 | 1960W | G. Stanley Anderson; David, Karen, Sharee, James D., Lynnae, Janell & SueAnn Howard [GJE] | 3 |
| 1625 | 1964J | Craig Pixton or Dorothy Souter [RAB] | 3 |
| 1644 | 1965W | A.D. Dunlap [JJ] | 1, 3 |
| 1645 | 1966J | Archie Dunlap [JJ] | 1, 3 |
| 1646 | 1967W | Fremont Dunlap [JJ] | 1, 3 |
| 1665 | 1968J | Kevin or Kaylene Elfrink [GAF] | 1, 3 |
| 1685 | 1970J | Elizabeth W. Evans [GAF] | 1, 3 |
| 1686 | 1971W | Kimberly Christine Evans [GAF] | 3 |
| 1760 | 1976J | Dennis or Marsha Fuhriman [GAF] | 3 |
| 1781 | 1980J | Dorthea Garlick [GAF] | 3 |
| 1868 | 1985W | Sybil Hambrick [GAF] | 1, 3 |
| 1876 | 1986J | Daryl J. Hansen [GAF] | 3 |
| 2906 | 2072G | * Donna Uhrey [EFG] | 3 |
| 1092 | 2149J | * O.W.L., a trust [EFG] | 1, 3 |
| 2869 | 2155G | * Reese & Lucy Thomson [EFG] | 1, 3 |
| 1112 | 85–0050W | * Richard & Stevens [EFG] | 1, 3 |
| 1633 | 85–0051G | * Edward & Jean Doyle [EFG] | 1, 3 |
| 2336 | 85–0052W | * Donna Mitchell [EFG] | 1, 3 |
| 1599 | 85–0053J | * Bryan or Thelma Denson [EFG] | 1, 3 |
| 1146 | 85–0112J | * Vishlia Properties [EFG] | 1, 3 |
| 2009 | 85–0113G | * Scott Hurst [EFG] | 1, 3 |
| 2173 | 85–0115J | * Paul & Louise Leitaker [EFG] | 1, 3 |
| 2421 | 85–0116J | * George & Anne Noller [EFG] | 1, 3 |
| | 85–0127W | * Chad Allen et al. [EFG] | |
| 0993 | 85–0381J | American Factoring [DWJ] | 1, 3 |
| 1053 | 85–0382W | Idaho Mountain Company | 3 |
| 1111 | 85–0384W | Ruess & Reno [DWJ] | 3 |
| 1122 | 85–0385J | Sanders & Merrick [DWJ] | 3 |
| 1129 | 85–0386W | Stanton & Mattes Co. [DWJ] | 1, 2, 3 |
| 1134 | 85–0387J | Street & Company [DWJ] | 1, 3 |

| Bankruptcy Court No. (83PA–) | District Court No. (C–84–) | Defendant (Merrill v.) [Attorney][1] | Claims |
|---|---|---|---|
| 1141 | 85–0388W | The Surety National Bank | 1, 3 |
| 1152 | 85–0389J | 5D Company & Richard Davis [LR] | 1, 3 |
| 1164 | 85–0390W | Milo Ahlstrand | 3 |
| 1443 | 85–0394W | Iris Child [DWJ] | 2 |
| 1641 | 85–0398W | Dalton Dulaney [DWJ] | 3 |
| 1642 | 85–0399J | Virginia Dulaney [DWJ] | 1, 3 |
| 1654 | 85–0400W | Eva Peterson & Steven Washburn [DWJ] | 1, 3 |
| 1690 | 85–0401J | Kelly & Dorothy Ewen | 1, 3 |
| 1947 | 85–0405J | Monte Scott Hill | 2 |
| 2095 | 85–0409J | Edwin & Muriel Keeney [DWJ] | 1, 3 |
| 2224 | 85–0414W | Lawrence & Elsie Madsen [DWJ] | 1, 3 |
| 2349 | 85–0415J | Rose Farmer for Clarence Moorman | 3 |
| 2464 | 85–0416W | Alfred & Phyllis Parker [GAF] | 1, 3 |
| 2520 | 85–0418W | Darlene & Sam Phillips [GAF] | 1, 2, 3 |
| 2808 | 85–0421J | Leon & Lauralea Stephens | 2 |
| 3055 | 85–0428W | Thomas Yarbrough | 3 |
| 2603 | 85–0437W | Thomas D. Richards | 2 |
| 1009 | 85–0774W | Chuck Henderson or Chumorah Enterprises [EFG] | 1, 2, 3 |
| 1336 | 85–0775G | Lois Britland [EFG] | 2 |
| 2174 | 85–0776W | Brent Lemmon [EFG] | 2 |
| 2176 | 85–0777G | Marie Lemmon [EFG] | 2 |
| 1110 | 85–0778J | Wendell Hoffman or Pyramid Trust [EFG] | 1, 2, 3 |
| 2175 | 85–0779W | Edward Lemmon [EFG] | 2 |
| 2695 | 85–0793G | Charles A. Schultz | 1, 3 |
| 1015 | 85–0796J | Collins, a Trust | 3 |
| 1056 | 85–0797J | Kim Crowther (J.B. Enterprises) [EFG] | 1, 3 |
| 1144 | 85–0798G | Universal Life Church | 3 |
| 1342 | 85–0799W | Steve Prockmeyer | 1, 2, 3 |
| 1353 | 85–0800J | Monte Brown | 2 |
| 1411 | 85–0801G | Ralph Cazel | 1, 3 |
| 1923 | 85–0802G | Dee Hedstrom | 3 |
| 2411 | 85–0805J | F. Kent Nielsen (Fine Diamonds, Inc.) | 1, 3 |
| 2490 | 85–0806W | Lara Peck [DWJ] | 3 |
| 2834 | 85–0809W | T.H. McDonald & R.J. Colton | 3 |
| 2954 | 85–0811W | Lila Watkins | 2 |
| 2959 | 85–0812G | Margaret O. & Lamar Wayman [DWJ] | 1, 2, 3 |

1. The attorneys of record for the defendants are represented by the following abbreviations:

| | | | |
|---|---|---|---|
| GRA | Garry R. Appel | GBH | Gregory B. Hadley |
| MB | Michael Belnap | DWJ | Daniel W. Jackson |
| RAB | Robert A. Bentley | JJ | John Judge |
| RHC | Richard H. Casper | HRK | H. Ralph Klemm |
| JD | John Danch | RL | Robert Lord |
| GJE | Glen J. Ellis | LRM | L. R. Magee |
| GAF | Gary A. Frank | JHM | Jack H. Molgard |
| WKG | William K. Gibson | LR | Lee Rudd |
| EFG | Edwin F. Guyon | TST | Thomas S. Taylor |

* Appeal from a bankruptcy court order denying a motion to set aside a default judgment or denying a motion to dismiss.